**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

PARENTS DEFENDING EDUCATION,

    *Plaintiff*,

v.

LINN-MAR COMMUNITY SCHOOL
DISTRICT, *et al.*,

    *Defendants*.

Case No. 22-cv-78-CJW-MAR

**EXPEDITED RELIEF REQUESTED**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR A PRELIMINARY INJUNCTION**

Alan R. Ostergren
Law Office of Alan Ostergren
500 Locust St., Suite 199
Des Moines, IA 50309
(515) 207-0314
alan.ostergren@ostergrenlaw.com

J. Michael Connolly (*pro hac vice forthcoming*)
James F. Hasson (*pro hac vice forthcoming*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Plaintiff Parents Defending Education*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... i

Introduction ...................................................................................................................... 1

Background ........................................................................................................................ 2

    I.      The Rights of Parents to Make Decisions Concerning Gender Identity .................. 2

    II.     The First Amendment Rights of Students in Public Schools ............................. 4

    III.    The District's Parental Exclusion and Speech Policy — Policy 504.13-R .......................... 5

        A.     The District's Policy on Gender Identity Transitions. ................................. 5

        B.     The District's Exclusion of Parents From Gender Identity Decisions. .................. 6

        C.     The District's Punishment of Disfavored Speech. ........................................ 7

    IV.    PDE and This Litigation ............................................................................. 8

Argument .......................................................................................................................... 10

    I.      PDE is Likely to Prevail on the Merits ................................................................. 11

        A.     The Policy violates parents' Fourteenth Amendment rights ........................ 11

        B.     The Policy violates the First and Fourteenth Amendments ........................ 14

            1.    The Policy unconstitutionally compels student speech. ................... 14

            2.    The Policy is an unconstitutional content-based and viewpoint-based regulation of student speech. ........................................ 15

            3.    The Policy is unconstitutionally overbroad. ........................................ 16

            4.    The Policy is unconstitutionally vague. ............................................. 17

    II.    PDE satisfies the remaining preliminary injunction criteria ............................... 18

Conclusion ........................................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Agudath Israel of Am. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020) ...........................................................................................................18

*Awad v. Ziriax,*
   670 F.3d 111 (10th Cir. 2012) .........................................................................................................19

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000) .......................................................................................................................15

*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971) .......................................................................................................................18

*Connally v. Gen. Constr. Co.,*
   269 U.S. 385 (1926) .......................................................................................................................17

*Craig v. Simon,*
   980 F.3d 614 (8th Cir. 2020) ..........................................................................................................10

*C.G.B. v. Wolf,*
   464 F. Supp. 3d 174 (D.D.C. 2020) ...............................................................................................18

*Dambrot v. Cent. Mich. Univ.,*
   55 F.3d 1177 (6th Cir. 1995) ..........................................................................................................16

*Dataphase Sys., Inc. v. C L Sys., Inc.,*
   640 F.2d 109 (8th Cir. 1981) ..........................................................................................................10

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022) ...................................................................................................................11

*Doe v. Heck,*
   327 F.3d 492 (7th Cir. 2003) ..........................................................................................................14

*Dorce v. Wolf,*
   506 F. Supp. 3d 142 (D. Mass. 2020) ............................................................................................18

*D.M. by Bao Xiong v. Minnesota State High Sch. League,*
   917 F.3d 994 (8th Cir. 2019) .....................................................................................................18, 19

*Elrod v. Burns,*
   427 U.S. 347 (1976) .......................................................................................................................19

*Gooding v. Wilson,*
   405 U.S. 518 (1972) .......................................................................................................................17

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ............................................................................................ 17, 18

*Flaherty v. Keystone Oaks School Dist.,*
   247 F. Supp. 2d 698 (W.D. Penn. 2003) ...................................................................17

*Iancu v. Brunetti,*
   139 S. Ct. 2294 (2019) ...........................................................................................16

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
   138 S. Ct. 2448 (2018) ....................................................................................... 14, 15

*Mahanoy Area Sch. Dist. v. B.L. by and through Levy,*
   141 S. Ct. 2038 (2021)...................................................................................4, 16, 17

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ..................................................................................15

*Meyer v. Nebraska,*
   262 U.S. 390 (1923) ...............................................................................................11

*Nken v. Holder,*
   556 U.S. 418 (2009) ...............................................................................................19

*Olson v. City of Elk Point, S.D.,*
   655 F. Supp. 2d 973 (D.S.D. 2009) .........................................................................14

*Parham v. J. R.,*
   442 U.S. 584 (1979) ............................................................................................2, 13

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,*
   268 U.S. 510 (1925) ............................................................................................2, 11

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ...............................................................................................16

*Reed v. Town of Gilbert,*
   135 S. Ct. 2218 (2015) ...........................................................................................16

*Ricard v. USD 475 Geary County, KS,*
   2022 WL 1471372 (D. Kan. May 9, 2022) ................................................................13

*Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers,*
   826 F.3d 1030 (8th Cir. 2016) .................................................................................16

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) ...............................................................................................16

Case 1:22-cv-00078-CJW-MAR   Document 3-1   Filed 08/05/22   Page 4 of 27

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ................................................................. 16, 17

*Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities,*
    359 U.S. 344 (1959) .................................................................................... 18

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.,*
    502 U.S. 105 (1991) .................................................................................... 15

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ....................................................................... 4

*Stanley v. Illinois,*
    405 U.S. 645, 651 (1972). ............................................................................ 2

*Stephenson v. Davenport Cmty. Sch. Dist.,*
    110 F.3d 1303 (8th Cir. 1997) ................................................................... 18

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ..................................................................... 14

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ..................................................................................... 4

*Troxel v. Granville,*
    530 U.S. 57 (2000) ............................................................................... passim

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ............................................................................. 17, 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................................... 11

*Westfield High School L.I.F.E. Club v. City of Westfield,*
    249 F. Supp. 2d 98 (D. Mass. 2003) ................................................... 16, 18

*West Virginia Bd. of Ed. v. Barnette,*
    319 U.S. 624 (1943) ............................................................................. 14, 15

*Willson v. City of Bel-Nor, Missouri,*
    924 F.3d 995 (8th Cir. 2019) ..................................................................... 16

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ............................................................................. 11, 12

**Statutes**

42 U.S.C. §1983 .......................................................................................... 14

Case 1:22-cv-00078-CJW-MAR   Document 3-1   Filed 08/05/22   Page 5 of 27

**Other Authorities**

1 W. Blackstone, Commentaries, 447.............................................................................................................. 3

2 J. Kent, Commentaries on American Law, 190............................................................................................. 3

## INTRODUCTION

Nearly a century of Supreme Court precedent makes two things clear: parents have a constitutional liberty interest in the care, custody, and control of their children, and students do not abandon their First Amendment rights at the schoolhouse gate. The Linn-Mar Community School District is flouting both of these constitutional guarantees through its recent adoption of Policy 504.13-R.

*First*, the Policy authorizes children to make fundamentally important decisions concerning their gender identity without any parental involvement and to then hide these decisions from their parents. Per the Policy, children can create a "gender support plan" to assist their gender "transition." Through this plan, the District can, among other things, (1) require all employees and students to address the child by a new name; (2) require all employees and students to address the child by a new pronoun; (3) have the child's name changed on numerous government documents, including identification cards, yearbooks, and diplomas; (4) allow the child to use the restrooms, locker rooms, and changing facilities that correspond with the child's gender identity; (5) allow the child to participate in physical education classes, intramural sports, clubs, and other events that correspond with the child's gender identity; and (6) allow the child to room with other students who share the child's gender identity.

The District will take these actions without *any* parental notification or involvement. Instead, these decisions will be made solely by the child and "school administrators and/or school counselors." And it is not just secrecy through silence. The District will withhold this information even if it is specifically requested by parents. Under the Policy, the District will not tell parents whether their child has requested a gender support plan, whether the child has made requests concerning their gender identity, or any other information that would reveal the child's "transgender status." Indeed, the District will openly deceive parents about what is happening at school if requested by the child. Parents

1

are completely and purposely left in the dark. The Policy plainly violates parents' rights under the Fourteenth Amendment.

***Second***, the Policy punishes students for expressing their sincerely held beliefs about biological sex and compels them to affirm the beliefs of administrators and their fellow students. Specifically, the Policy prohibits speech that doesn't "respect a student's gender identity" and "misgendering," which is defined as "intentionally or accidentally us[ing] the incorrect name or pronouns to refer to a person." Ex. I at 6. The Policy is so overbroad and vague that it prohibits countless forms of expression on issues of public importance, such as whether students should be allowed to compete in sports that correspond to their gender identity. This speech code blatantly violates the First and Fourteenth Amendments.

Parents Defending Education ("PDE") is a membership organization whose members include parents within the Linn-Mar school district. These parents want to know whether their children are being subjected to policies concerning their gender identity; they want to control how decisions are made concerning these fundamentally important issues; and they want their children to be free to express themselves without fear of punishment. The Court should grant PDE's motion for a preliminary injunction.

## BACKGROUND

## I.    The Rights of Parents to Make Decisions Concerning Gender Identity

"[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). Children are "not the mere creature of the state," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and the "right[] … to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man.'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are rooted in the "historical[] … recogni[tion] that natural bonds

Case 1:22-cv-00078-CJW-MAR   Document 3-1   Filed 08/05/22   Page 8 of 27

of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries, 447; 2 J. Kent, Commentaries on American Law, 190).

A child's gender identity implicates the most fundamental issues concerning the child, including the child's religion, medical care, mental health, sense of self, and more. Yet despite "extensive precedent" that parents must be involved in decisions concerning these types of issues, *Troxel*, 530 U.S. at 66 (listing cases), school districts across the country are increasingly excluding parents from decisionmaking when gender identity is involved. "In the past few years, school districts nationwide have quietly adopted policies requiring staff to facilitate and 'affirm' gender identity transitions at school without parental notice or consent—and even in secret from parents." Ex. A at 1.[1] A school district in Wisconsin, for example, recently instructed teachers that "parents 'are not entitled to know their kids' identities' and that 'this knowledge must be earned.'" Ex. A at 2. One mother in California "went two years without knowing her sixth grader had transitioned at school." Ex. Y at 3. "Basically, I was the last one to find out," said the mother. Ex. Y at 3. "They were all saving my kid from me." Ex. Y at 3. The mother only made the discovery "when she took her child to the hospital one day and a doctor told her. She was stunned." Ex. Y at 3.

Even though "[t]ransitioning at a young age poses special risks and complications," Ex. A at 3, these parental exclusion policies give ultimate decisionmaking authority to children, often with input from a teacher or school employee who displaces parents' role in the process. Under parental exclusion policies, "[e]ducators and staff," not parents, "work closely with the student to determine what changes are necessary . . . to ensure their safety and well-being." Ex. B at 7-8. Often, that process is formalized in a "Gender Support Plan" created by the school for the child. *See, e.g.*, Ex. C at 2.

---

[1] "Ex." refers to exhibits to the Declaration of James Hasson.

These exclusionary policies are not just unconstitutional; they are harmful to both parents and children. According to Erica Anderson, a clinical psychologist who identifies as transgender and is the former president of the U.S. Professional Association for Transgender Health, "leaving parents in the dark is not the answer." Ex. Y at 3. "If there are issues between parents and children, they need to be addressed." Ex. Y at 3. Such secrecy "only postpones . . . and aggravates any conflict that may exist." Ex. Y at 3. In a world in which schools "routinely send notes home to parents about lesser matters," such as "playground tussles, missing homework, and social events," there is absolutely no justification for withholding such fundamentally important information from their parents. Ex. Y at 2.

## II.    The First Amendment Rights of Students in Public Schools

Public-school students have First Amendment rights, and those rights do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021). Protecting unpopular speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

Despite these well-established rights, schools often seek to stamp out controversial student expression. Speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected. Ex. O at 10. Speech codes punish students for undesirable categories of speech such as "harassment," "bullying," "hate speech," and "incivility." Ex. O at 10. Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. Ex. O at 10, 24; *Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

4

Schools are increasingly adopting speech codes regarding gender identity to compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions. So-called "preferred pronouns policies" are an increasingly used method of compelling student speech. "Preferred pronoun policies" subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, Ex. P. Other speech codes are written so broadly or vaguely that they effectively shut down all discussion or debate concerning transgender issues. *See, e.g.,* Ex. O at 29.

## III.  The District's Parental Exclusion and Speech Policy – Policy 504.13-R

On April 25, 2022, over fierce opposition from parents, Ex. N; Ex. R, the Linn-Mar School Board adopted Policy 504.13-R, entitled "Administrative Regulations Regarding Transgender and Students Nonconforming to Gender Role Stereotypes." *See* Ex. I. The Policy is designed to do three things (1) effectuate students' "gender transition" requests; (2) keep the District's actions secret from the student's parents; and (3) punish other students who do not use a student's preferred pronouns when speaking or who voice certain opinions concerning transgender issues.

### A.  The District's Policy on Gender Identity Transitions

Policy 504.13-R gives "[a]ny student, regardless of how they identify," the right to meet with a school administrator or school counselor to create and implement a "Gender Support Plan." Ex. I at 2. A Gender Support Plan is defined as a "document that may be used to create a shared understanding about the ways in which a student's gender identity will be accounted for and supported at school." Ex. I at 6. When a student requests a Gender Support Plan, the school "will hold a meeting with the student within 10 school days of being notified about the request." Ex. I at 2. The student's parents have no right to participate in this meeting or to even know that it is happening. Ex. I at 1-2. The Policy states that "[t]he student should agree with who is a part of the meeting, including whether

their parent/guardian will participate." Ex. I at 1-2. It also specifies that the student "will have priority of their support plan *over their parent/guardian*." Ex. I at 1 (emphasis added).

Students can use their Gender Support Plan to make critically important decisions about their identity, health, and education, and the District will agree to them without *any* parental involvement or notification. In particular, the student can choose to:

- Be addressed by all school employees and students by a new name. *See* Ex. I at 3 ("Every student has the right to be addressed by a name . . . that corresponds to their gender identity.").

- Have their name changed for all "logins, email systems, student identification cards, non-legal documents such as diplomas and awards, yearbooks, and at events such as graduation." Ex. I at 3

- Be addressed by all school employees and students by a new pronoun. *See* Ex. I at 3 ("Every student has the right to be addressed by a . . . pronoun that corresponds to their gender identity.").

- Use restrooms, locker rooms, and changing facilities that correspond to the student's gender identity. *See* Ex. I at 3 ("With respect to restrooms, locker rooms, and/or changing facilities; students shall have access to facilities that correspond to their gender identity.").

- Participate in "physical education classes, intramural sports, clubs, and school events in a manner consistent with their gender identity." Ex. I at 4.

- Be allowed to "room with other students who share their gender identity" on overnight fieldtrips. Ex. I at 4.

While students can make these requests through a Gender Support Plan, they need not go through this process to make these requests and have them granted by the District. *See* Ex. I at 2.

## B. The District's Exclusion of Parents from Gender-Identity Decisions

The Policy prevents parents from having knowledge or control over their child's decisions involving gender identity. According to the Policy, "[a]ny student in seventh grade or older will have priority of their support plan over their parent/guardian," and parents have no right to know about or be "a part of the meeting" to develop a Gender Support Plan. Ex. I at 1-2. Many decisions regarding

a student's gender identity will be made "regardless of age" and regardless of whether the District has the parent's consent. Ex. I at 3.

Importantly, the District will not tell parents whether their child has requested or been given a Gender Support Plan, whether the child has made requests or actions have been taken concerning their gender identity, or whether it has any other information that would reveal the child's "transgender status." Ex. I at 1-3; *e.g.,* Ex. I at 2 (the District "shall not disclose information that may reveal a student's transgender status to others including . . . parents . . . unless legally required to do so (such as national standardized testing, drivers permits, transcripts, etc.), or unless the student has authorized such disclosure"); *id.* ("School staff should always check with the student first before contacting their parent/guardian."). Indeed, the Policy openly encourages children to deceive their parents by hiding the name and pronouns that they are using at school. *See id.* ("School staff should ask the student what name and pronouns they would like school officials to use in communications with their family.").

The Policy further requires that a student's Gender Support Plan and "all written records related to student meetings concerning their gender identity and/or gender transition" must be maintained in a "temporary file" that shall be "maintained by the school counselor." Ex. I at 2, 5. The Policy defines "gender identity" and gender "transition" broadly to include a host of important information about a child, including "social, medical, and/or legal" information concerning any transition. Ex. I at 6-7. These "temporary" records "will only be accessible to staff members that the student has authorized in advance to do so." Ex. I at 5.

## C.    The District's Punishment of Disfavored Speech

In addition to attempting to eliminate parental rights, the Policy requires students to use other students' preferred pronouns when speaking and prohibits a vast array of protected speech. Ex. I at 3. Under the Policy, "[a]n intentional and/or persistent refusal by . . . students to respect a student's gender identity is a violation of school board policies 103.1 Anti-Bullying and Harassment, 104.1 Equal

Educational Opportunity, and 104.3 Prohibition of Discrimination and/or Harassment based on Sex Per Title IX." Ex. I at 3. In addition, the Policy prohibits "[r]epeated or intentional misgendering." Ex. I at 6. The Policy defines "misgendering" as "intentionally or accidentally us[ing] the incorrect name or pronouns to refer to a person." Ex. I at 6. Potential disciplinary sanctions for violating these provisions "include suspension and expulsion." *See* Ex. Q at 3; Ex. I at 3.

## IV.    PDE and This Litigation

PDE is a nationwide, grassroots membership organization whose mission is to prevent the politicization of K-12 education, including government attempts to coopt parental rights and to silence students who express opposing views. Neily Decl. ¶3. PDE furthers this mission through network and coalition building, disclosure of harmful school policies, advocacy, and, if necessary, litigation. Neily Decl. ¶5. PDE has members who are harmed by the Policy, including Parents A-G. *See* Parent A Decl. ¶¶8-13; Parent B Decl. ¶¶8-13; Parent C Decl. ¶¶10-15; Parent D Decl. ¶¶7-10; Parent E Decl. ¶¶6-9; Parent F Decl. ¶¶6-9; Parent G Decl. ¶¶7-11; Neily Decl. ¶¶6-7.

Parent A's child recently completed the sixth grade at a Linn-Mar elementary school and was supposed to enroll in a Linn-Mar middle school this fall. Parent A Decl. ¶¶4, 13. Parent A's child is on the autism spectrum and has a sensory processing disability. Parent A Decl. ¶5. Parent A has devoted "significant resources to therapy services to help [their] child understand sex-specific differences." Parent A Decl. ¶5. Still, Parent A's child "sometimes makes statements that could lead an outside observer to believe that [their] child is confused about their gender identity or expressing a 'gender-fluid' or 'non-binary' identity." Parent A Decl. ¶5. Parent A wants to ask the District on a regular basis whether their child has requested or been given a Gender Support Plan, whether their child has made requests or actions have been taken concerning the child's gender identity, and whether the District has any other information that would reveal their child's "transgender status." Parent A Decl. ¶9. Parent A wants to receive this information without seeking "permission" from their child.

8

Parent A Decl. ¶9. Under the Policy, however, the District will withhold this information from Parent A. Ex. I. at 1-3. Indeed, Parent A repeatedly "requested confirmation that the school district will not assign [their] child a Gender Support Plan or take any other gender identity-related actions without informing [Parent A] and obtaining [Parent A's] consent." Parent A Decl. ¶12. But the District refused to provide those assurances. Parent A Decl. ¶12.

Parent A believes there is a substantial risk that their child will receive a Gender Support Plan or other gender "affirming" actions from District officials. Parent A Decl. ¶8; *see also* Ex. G at 4-6; Ex. H at 2; Ex. W at 137-42; Ex. U at 97; Ex. D at 104. When this happens, Parent A wants to exercise their "fundamental right as a parent to guide their child's upbringing and to help their child navigate any issues that might arise regarding their perception of their gender identity." Parent A Decl. ¶10. This is especially important for Parent A because strong parent-child relationships are critical for the development of children with autism. *See, e.g.*, Ex. S at 12; Ex. T at 1. To avoid the harms caused by the Policy, Parent A has decided to withdraw their child from enrollment in the Linn-Mar middle school the child was scheduled to attend. Parent A Decl. ¶13. Parent A will enroll their child in middle school at Linn-Mar the following year only if the Policy is rescinded. Parent A Decl. ¶13.

The children of Parents B and C attend Linn-Mar high school. Parent B Decl. ¶4; Parent C Decl. ¶4. Parents B and C want to ask the District on a regular basis whether their children have requested or been given a Gender Support Plan, whether their children have made requests or actions have been taken concerning their children's gender identity, and whether the District has any other information that would reveal their children's "transgender status." Parent B Decl. ¶8; Parent C Decl. ¶10. Parents B and C want to receive this information without asking for their children's "permission." Parent B Decl. ¶8; Parent C Decl. ¶10. Under the Policy, however, the District will withhold this information from Parents B and C. Ex. I. at 1-3. In addition, Parents B and C believe there is a substantial risk that their children will receive a Gender Support Plan or other gender "affirming"

actions from District officials. Parent B Decl. ¶¶5-7; Parent C Decl. ¶¶6-9; *see* Ex. V at 31; Ex. E at 2; Ex. F at 1585. When this happens, Parents B and C want to "exercise [their] fundamental right[s]" to guide "[their children's] upbringing[s]" and help them "navigate any issues that might arise regarding [their] perception of [their] gender identit[ies]." Parent B Decl. ¶9; Parent C Decl. ¶11. Under the Policy, however, the Parents' roles "will be displaced by Linn-Mar administrators" who do not know their children as well as they do. Parent B Decl. ¶9; Parent C Decl. ¶12.

The children of Parents D, E, F, and G believe that people are either male or female and that a person cannot "transition" from one sex to another. Parent D Decl. ¶6; Parent E Decl. ¶5; Parent F Decl. ¶5; Parent G Decl. ¶6. Their children do not want to be forced to affirm that a biological male is a female, or vice versa. Parent D Decl. ¶6; Parent G Decl. ¶6; *see also* Parent E Decl. ¶7; Parent F Decl. ¶7. When issues involving gender identity arise (for example, in class or during school sponsored activities), their children want to speak about those topics and state their beliefs that biological sex is immutable. *E.g.*, Parent G Decl. ¶¶7-8. Under the Policy, however, their children can be punished merely for expressing an opinion about the nature of biological sex, declining to use another student's "preferred pronouns," or simply for expressing discomfort about sharing bathrooms or locker rooms with students or teachers of the opposite sex. Ex. I at 3; Parent D Decl. ¶9; Parent E Decl. ¶6; Parent F Decl. ¶6; Parent G Decl. ¶8. As a result, their children remain silent in school environments or avoid using sex-specific pronouns altogether. Parent D Decl. ¶7; Parent G Decl. ¶9.

## ARGUMENT

In determining whether a preliminary injunction is warranted, a district court considers four factors: "'(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.'" *Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The likelihood

of success on the merits is "'[t]he most important of the *Dataphase* factors.'" *Id.* Because PDE satisfies

all four requirements, the Court should issue a preliminary injunction.

**I.        PDE is likely to prevail on the merits.**

**A.        The Policy violates parents' Fourteenth Amendment rights.**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty,

or property, without due process of law." Under binding precedent, the Amendment "includes a

substantive component that 'provides heightened protection against government interference with

certain fundamental rights and liberty interests.'" *Troxel*, 530 U.S. at 65 (quoting *Washington v.*

*Glucksberg*, 521 U.S. 702, 720 (1997)). Among these unenumerated rights are those that are "'deeply

rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty.'" *Dobbs*

*v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257-58 (2022) (quoting *Glucksburg*, 521 U.S. at 721).

The "liberty interest . . . of parents in the care, custody, and control of their children[] is

perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*,

530 U.S. at 65. Nearly 100 years ago, the Supreme Court held that the "liberty" protected by the

Fourteenth Amendment includes the right of parents to "establish a home and bring up children" and

"to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Two years later,

the Court held that the "liberty of parents and guardian" includes the right "to direct the upbringing

and education of children under their control." *Pierce*, 268 U.S. at 534-35. As the Court explained,

"[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have

the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at

535.

Again and again, the Supreme Court has affirmed the "fundamental right of parents to make

decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (listing

cases). Simply put, "[t]he history and culture of Western civilization reflect a strong tradition of

parental concern for the nurture and upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Id.*

The Policy violates parents' constitutional rights. The Policy deprives parents of their right to know what actions the District is taking with regards to fundamentally important decisions about their children. PDE's members want to ask on a regular basis whether their children have requested or been given a Gender Support Plan, whether their children have made requests or actions have been taken concerning their children's gender identity, and whether the District has any other information that would reveal their children's "transgender status." Yet under the Policy, the District *will not tell them* any of this information. Ex. I at 1-3. It is impossible for parents to direct the "care, custody, and control of their children" when the government deliberately withholds critical information from them.

The Policy also deprives parents of the right to have any input or control over fundamental decisions concerning gender identity. Under the Policy, the parent has no control over how the District treats their child. Without *any* parental input, the District can (1) require all employees and students to address the child by a new name; (2) require all employees and students to address the child through a new pronoun; (3) have the child's name changed on numerous government documents, including identification cards, yearbooks, and diplomas; (4) allow the child to use the restrooms, locker rooms, and changing facilities that correspond with the child's gender identity; (5) allow the child to participate in physical education classes, intramural sports, clubs, and other events that correspond with the child's gender identity; and (6) allow the child to room with other students who share the child's gender identity. Ex. I at 3-4. These are *fundamental decisions* implementing the most basic questions about a child's life, including issues of religion, medical care, mental and emotional well-being, the child's sense of self, and more.

12

A recent decision from the District of Kansas is directly on point. There, a local school board policy prohibited teachers from "revealing to a student's parents a preferred name or pronouns the student is using at school if the student has not authorized the parents to know." *Ricard v. USD 475 Geary County, KS*, 2022 WL 1471372, at *4-5 (D. Kan. May 9, 2022). Discussing the "constitutional right [of parents] to control the upbringing of their children," the court found it inconceivable that a school district could constitutionally "withhold[] or conceal[] from the parents of minor children information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." *Id.* at *8. Whether "the District likes it or not," the constitutional right of parents "includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." *Id.*

The Linn-Mar School District "may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name," to use different pronouns, or to implement other decisions involving gender identity. *Ricard*, 2022 WL 1471372, at *8. But this "merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit." *Id.* Indeed, that the District takes such extraordinary steps to hide these decisions from parents on its face confirms the importance of these issues to parents.

The government must afford a "presumption of validity" to parental decisions unless there is clear evidence to the contrary. *Troxel*, 530 U.S. at 67. As "long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69; *see Ricard*, 2022 WL 1471372, at *8 (envisioning a "particularized and substantiated concern that disclosure to a parent could lead to child abuse, neglect, or other *illegal* conduct"). But "[s]imply because the decision of a parent is not agreeable to a child …

13

does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 60.

Here, the District "not only fail[s] to presume" that parents will "act in the best interest of their children, [it] assume[s] the exact opposite." *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003). The District has *no right* to deprive parents of this critical information and control concerning their children. Indeed, the District requires parental notification and consent before taking actions that pale in importance. *See, e.g.,* Ex. K at 1 (requiring a "signed and dated authorization from the parent/legal guardian" before a student can receive a "standard dose acetaminophen or ibuprofen"); Ex. J at 1 (requiring parental notification "as soon as possible" when "a student becomes ill . . . at school or a school-sponsored activity"); Ex. L at 1 (requiring parents to "be informed about the risk of [school-sponsored] activit[ies]"). The Policy plainly violates the Fourteenth Amendment and Section 1983.[2]

## B. The Policy violates the First and Fourteenth Amendments.

The Policy also violates the First and Fourteenth Amendments through its speech restrictions. The Policy compels speech, it regulates speech based on content and viewpoint, it is overbroad, and it is unconstitutionally vague.

### 1. The Policy unconstitutionally compels student speech.

The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "[T]he latter is perhaps the more sacred of the two rights." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox

---

[2] For purposes of Section 1983, the District is clearly acting pursuant to a "policy, custom, pattern, or practice" because, among other reasons, it is acting through an "express policy endorsed or ordered" by the district, the Policy is a custom or practice that is pervasive and widespread, *see* Ex. M; Ex. X, and the Policy was enacted by Linn-Mar officials with final policymaking authority, *Olson v. City of Elk Point, S.D.*, 655 F. Supp. 2d 973, 976 (D.S.D. 2009).

14

in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein.*" *West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943) (emphasis added). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

The Policy is no different from the one requiring schoolchildren to pledge allegiance to the flag in *Barnette*. Like the West Virginia State Board of Education in *Barnette*, the District is requiring students to affirmatively declare statements that they believe to be false and affirm ideologies with which they deeply disagree. The children of Parents D-G believe that biological sex is inherent and immutable. Parent D Decl. ¶6; Parent E Decl. ¶5; Parent F Decl. ¶5; Parent G Decl. ¶6. They "bear no ill will" towards other students, but they do not want to be forced to "affirm" that a biologically male student is actually a female—or vice versa—or that another student is neither male nor female. Parent D Decl. ¶6; Parent G Decl. ¶6; *see also* Parent E Decl. ¶7; Parent F Decl. ¶7. Yet that is exactly what the Policy requires. Ex. I at 6.

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) is directly on point. There, the Sixth Circuit held that a similar "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id.* at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)). The District cannot force the children of Parents D-G to "mouth support" for beliefs they do not hold. *Janus*, 138 S. Ct. at 2463.

### 2. The Policy is an unconstitutional content-based and viewpoint-based regulation of speech.

"If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea itself offensive or

15

disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see, e.g., Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123 (D. Mass. 2003) (school policy allowing only "responsible" speech was a content-based regulation subject to strict scrutiny). In addition, "the First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *Mahanoy*, 141 S. Ct. at 2046 (schools cannot "suppress speech simply because it is unpopular").

Here, the District has adopted a policy that disciplines students for the content and viewpoint of their speech. Specifically, the Policy prohibits "an intentional and/or persistent refusal to respect a student's gender identity." Ex. I at 3. The Policy also prohibits "misgendering," which it defines as instances "[w]hen a person accidentally or intentionally uses the incorrect name or pronouns to refer to a person." Ex. I at 6. This is a classic content-based and viewpoint-based regulation of speech. *See, e.g., Saxe v. State College Area School District*, 240 F.3d 200, 206 (3d Cir. 2001) (bans on "'harassment'" covering speech impose "'content-based'" and often "'viewpoint-discriminatory'" restrictions on that speech). The District has no compelling interest in suppressing this type of student speech, and, even if it did, the District's restrictions are not narrowly tailored to further that interest. *See Mahanoy*, 141 S. Ct. at 2046; *see also Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1001 (8th Cir. 2019).

### 3. The Policy is unconstitutionally overbroad.

The First Amendment prohibits schools from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d

16

1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive," the government "may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id.*

The Policy is unconstitutionally overbroad. By its terms, the Policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody—could be perceived as "a refusal … to respect a student's gender identity." Ex. I at 3. The Policy also does not differentiate between "on campus" and "off campus" speech, *see id.*, even though the District's ability to punish off-campus speech is extremely limited, *see Mahanoy*, 141 S. Ct. at 2046. Courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g., Saxe*, 240 F.3d at 215-16 (high school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks School Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Penn. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad).

### 4. The Policy is unconstitutionally vague.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A government policy is unconstitutionally vague when it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). A policy is also unconstitutionally vague when it has no "explicit standards for those who apply them" and thus "impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109. This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes

with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

The Policy is void for vagueness because it gives students no guidance about what speech is permitted and what speech isn't. The Policy doesn't specify what constitutes an "intentional or persistent refusal … to respect a student's gender identity." Ex. I at 3. This absence of a clear standard also creates a serious risk that school officials will enforce the policy in an arbitrary manner, determining on an "ad hoc and subjective basis" what speech is "disrespectful" and deserves punishment and what speech is acceptable. *Grayned*, 408 U.S. at 109; *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971); *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1310 (8th Cir. 1997); *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 127 (speech policy allowing only "responsible" speech unconstitutionally vague because it "reserves a measure of judgment and discretion to whatever school administrator a student happens to turn for advice on the matter").

## II.     PDE satisfies the remaining preliminary-injunction criteria.

Because PDE is likely to prevail on its claims, the other criteria for a preliminary injunction are easily satisfied.

***Irreparable Harm***. The "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217 (D.D.C. 2020)); *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (same). Without an injunction, PDE's members will be denied their constitutional rights as parents to know about, influence, and control the most fundamental decisions concerning their children. *Supra* 11-14; *see D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1004 (8th

Cir. 2019) (violation of students' Fourteenth Amendment rights is irreparable harm). The children of PDE's members also will be deprived of their First Amendment rights to free speech. *Supra* 14-18; *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

 ***Balance of Harms and the Public Interest***: The balance of the equities and the public interest factors "merge when the Government is the party opposing the preliminary injunction." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors weigh in favor of injunctive relief because it is "'always in the public interest to prevent the violation of a party's constitutional rights.'" *D.M. by Bao Xiong*, 917 F.3d at 1004 (quoting *Awad v. Ziriax*, 670 F.3d 111, 1132 (10th Cir. 2012)). Nor does the District have any valid interest in stripping parents of their constitutional rights or suppressing protected speech.[3]

## CONCLUSION

 For the foregoing reasons, the Court should grant PDE's motion and preliminarily enjoin Defendants from enforcing the Policy during this litigation.

---

[3] The court should not require a bond. Courts have "sound discretion" to determine whether a bond is appropriate. *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). Waiving the bond requirement is particularly appropriate here because PDE is likely to succeed on the merits and Defendants will incur no harm from an injunction that merely forces them to follow the Constitution.

Dated: August 5, 2022

Respectfully submitted,

/s/ Alan R. Ostergren
Alan R. Ostergren
Law Office of Alan Ostergren
500 Locust St., Suite 199
Des Moines, IA 50309
(515) 207-0314
alan.ostergren@ostergrenlaw.com

J. Michael Connolly (*pro hac vice forthcoming*)
James F. Hasson (*pro hac vice forthcoming*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
james@consovoymccarthy.com

*Counsel for Plaintiff Parents Defending Education*

## CERTIFICATE OF SERVICE

I certify that on August 5, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification to all counsel of record.

Because Defendants have not yet entered an appearance, and with Defendants' counsel's consent, I am also serving the foregoing by email to Defendants' counsel at the email address below:

Miriam Van Heukelem
Ahlers & Cooney P.C.
100 Court Avenue, Suite 600
Des Moines, IA 50309
MVanHeukelem@ahlerslaw.com

*/s/ Alan R. Ostergren*