**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| PARENTS DEFENDING EDUCATION., | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:22-CV-78-CJW-MAR |
| LINN-MAR COMMUNITY SCHOOL | ) |
| DISTRICT, *et al.*, | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |
| | ) |
| | ) |

_____

**BRIEF OF AMICI CURIAE ONE IOWA AND IOWA SAFE SCHOOLS IN SUPPORT**
**OF DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**
_____

# TABLE OF CONTENTS

**Page**

INTRODUCTION & INTEREST OF AMICI ............................................................................. 1

ARGUMENT .................................................................................................................. 2

I.     GENDER IDENTITY OFTEN DEVELOPS AT AN AGE WHEN SCHOOL
ENVIRONMENTS ARE CRITICALLY IMPORTANT. .................................................. 2

II.    TGNC YOUTH FACE INCREASED RISKS IN A VARIETY OF AREAS, MAKING
SUPPORTIVE SCHOOL ENVIRONMENTS VITAL TO THEIR SAFETY AND
SUCCESS. ............................................................................................................ 3

     A.    Mental health issues are endemic among TGNC young people. ........................... 4

     B.    TGNC young people are frequent victims of bullying, abuse, and violence,
including at school. ............................................................................................. 5

     C.    Supportive and welcoming schools can make a real difference in TGNC
young people's lives. .......................................................................................... 6

III.    IN THE WRONG CIRCUMSTANCES, TGNC YOUTH FACE SEVERE RISKS FROM
UNSUPPORTIVE OR HOSTILE FAMILY MEMBERS. .............................................. 9

IV.    APPROPRIATE ANTI-BULLYING AND HARASSMENT POLICIES PROTECTING
TRANSGENDER STUDENTS' EQUAL PROTECTION AND CIVIL RIGHTS ARE
NOT A FACIAL VIOLATION OF THE FIRST AMENDMENT ..................................... 12

     A.    Schools may appropriately regulate student speech to prevent bullying and
harassment under *Tinker* ................................................................................. 13

     B.    Appropriate anti-bullying and harassment policies protect students' equal
protection and civil rights .................................................................................. 16

     C.    The Plaintiff has not demonstrated a likelihood of success on the merits in
arguing that the Administrative Policies are a Violation of Free Speech ............ 17

IV.    CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986) .......................................................13, 19

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ........................................................................17

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) .....................................13,14, 15

*B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734 (8th Cir. 2009) ...........................................15

*C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142 (9th Cir. 2016) .......................................................14

*D.J.M. v. Hannibal Public Sch. Dist. No. 60*, 647 F.3d 754 (8th Cir. 2011) ...............................15

*Doe v. Hopkinton Pub. Sch.*, 490 F. Supp. 3d 448 (D. Mass. 2020), *aff'd*, 19 F.4th 493 (1st Cir. 2021) ...........................................................................................................................................16

*Flores v. Morgan Hill Unified Sch. District*, 324 F.3d 1130 (9th Cir. 2003) ...............................17

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992) ...........................................................17

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52 (1st Cir. 2002) ....................................................17

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001) ..............................................................................................................................................17

*Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) .....................................................................................16

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) .......................................................13, 14

*Jennings v. Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007) ...............................................................17

*Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565 (4th Cir. 2011), *cert. denied,* 132 S. Ct. 1095 (2012) .......................................................................................................................................15

*Lowery v. Euverard,* 497 F.3d 584 (6th Cir. 2007) .......................................................................14

*Mahanoy Area School District v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021) .............14, 16

*Morse v. Frederick*, 551 U.S. 393 (2007) ..............................................................................14, 19

*Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996) .......................................................................16

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12 (1st Cir. 2020) ............................15

*Obergefell v. Hodges*, 576 U.S. 644 (2015)...............................................................................16

*Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006) .................................14

*Romer v. Evans*, 517 U.S. 620 (1996)........................................................................16

*Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345 (8th Cir. 2020) .......................................18

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) .................................................20

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243 (3d Cir. 2002)..............................20

*Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503 (1969) ..................................... *passim*

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995)..................................................14

*West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ................................................13

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017),
  *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir.
  2020)..........................................................................................................................16, 17

## Statutes & Regulatory Authorities

Iowa Code § 216.7(1) ..................................................................................................17

Iowa Code § 216.9 ......................................................................................................17

Iowa Code § 280.28(2)(b)...........................................................................................18

Iowa Civil Rights Comm'n, *Sexual Orientation, Gender Identity, and Iowa's Safe
  Schools Law*,
  https://icrc.iowa.gov/sites/default/files/publications/2018/SOGI_Education_May18.pdf .....17

Iowa Dep't of Educ., *Sample Anti-Bullying/Anti-Harassment Policy*,
  https://educateiowa.gov/sites/files/ed/documents/Anti-
  Bullying%20Harassment%20Sample%20Policy.pdf ...........................................................18

U.S. Dep't of Ed., OCR, Dear Colleague (Oct. 26, 2010),
  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html...........................17

U.S. Dep't of Ed., OCR, First Amendment: Dear Colleague (July 28, 2003),
  https://www2.ed.gov/about/offices/list/ocr/firstamend.html ...................................................17

U.S. Dep't of Ed., OCR, Notice of Investigative Guidance, Racial Incidents and Harassment, 59
  Fed. Reg. 11448, (Mar. 10, 1994),
  https://www2.ed.gov/about/offices/list/ocr/docs/race394.pdf ................................................17

**Other Authorities**

Am. Psych. Ass'n, "Gender Dysphoria Diagnosis,"
https://www.psychiatry.org/psychiatrists/cultural-
competency/education/transgender-and-gender-nonconforming-
patients/gender-dysphoria-diagnosis....................................................................................4

Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and
Gender Nonconforming People*, 70 Am. Psych. 832 (Dec. 2015).............................................1

Am. Psychiatric Ass'n, *Gender Dysphoria*, Diagnostic & Statistical Manual, ch.
17 (5th ed. 2013) ...................................................................................................................3

Jack Andrzejewski et al, *Perspectives of Transgender Youth on Parental Support:
Qualitative Findings from the Resilience and Transgender Youth Study*, 48
Health Educ. & Behavior 74 (2021) ...............................................................................9, 11

Maureen D. Connolly et al., *The Mental Health of Transgender Youth: Advances
in Understanding*, 59 J. Adolescent Health 489 (2016).......................................................4

Ctrs. for Disease Control & Prevention, *School Connectedness: Strategies for
Increasing Protective Factors Among Youth* (2009) ...........................................................4

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty
Suppression and Gender Reassignment*, 134 *Pediatrics* 696 (Oct. 2014)..............................8

Milton Diamond, *Transsexuality Among Twins: Identity Concordance, Transition,
Rearing, and Orientation*, 14 Int'l J. Transgenderism 24 (2013) .........................................2

Joseph A. Durlak et al., *The Impact of Enhancing Students' Social and Emotional
Learning: A Meta-Analysis of School-Based Universal Interventions*, 82 Child
Dev. 405 (Jan./Feb. 2011)....................................................................................................3

Tina Fetner & Athena Elafros, *The GSA Difference: LGBTQ and Ally Experiences
in High Schools with and without Gay-Straight* Alliances, 4 Soc. Sci. 563
(Aug. 7, 2015) ...................................................................................................................7, 8

Arnold H. Grossman et al., *Parental Responses to Transgender and Gender
Nonconforming Youth: Associations with Parent Support, Parental Abuse,
and Youths' Psychological Adjustment*, J. Homosexuality (Nov. 27, 2019) ....................11-12

Kasey B. Jackman et al., *Suicidality among Gender Minority Youth: Analysis of
2017 Youth Risk Behavior Survey Data*, 11 tbl.4, Archives of Suicide
Research (2019) .....................................................................................................................5

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* (2016)............5, 9, 10, 11

@jew.shua, Instagram (July 25, 2020), https://www.instagram.com/p/CDFLe7PHPfK/ (kid-created viral guide on trans-inclusive language) ...................................................13

Augustus Klein & Sarit A. Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults*, 3 LGBT Health 193 (2016) .............................................11

Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020)...........................................................................6

Molly O'Shaughnessy et al., Cal. Safe Schs. Coal., *Safe Place to Learn: Consequences of Harassment Based on Actual or Perceived Sexual Orientation and Gender Non-Conformity and Steps For Making Schools Safer* (Jan. 2004)..............................................................................................7

Kristina R. Olson, et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics 1 (Mar. 2016)................................8

Pa. State Univ., *Improving Social Emotional Skills in Childhood Enhances Long-Term Well-Being and Economic Outcomes* (2017) ...................................3

Carolyn Porta et al., *LGBTQ Youth's Views on Gay-Straight Alliances: Building Community, Providing Gateways, and Representing Safety and Support*, 87 J. Sch. Health 489 (2017) .....................................................................8

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Pediatrics, Official Journal of the American Academy of Pediatrics (October 2018)....................................2

Andrea L. Roberts et al., *Childhood Gender Nonconformity: A Risk Indicator for Childhood Abuse and Posttraumatic Stress in Youth*, 129 Pediatrics 410 (Mar. 2012) ....................................................................................... 9-10

Stephen T. Russell at al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health (2018) ...................................................7

Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, J. Homosexuality (Nov. 7, 2018) ......................................10

Kait Sanchez, How a Teen Punk Led a Movement for Disabled People Online, The Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation ........................................................................12

Lisa Simons et al., *Parental Support and Mental Health Among Transgender Adolescents*, 53 J. Adolescent Health 791 (2013)....................................9

Rebecca L. Stotzer, *Violence against transgender people: A review of United States data*, 14 Aggression & Violent Behavior 170 (2009) .....................................................5

Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psychology 1580 (2010).......................................................7

The Trevor Project, *National Survey on LGBTQ Youth Mental Health* (2020) .................... *passim*

Anna Turns, Meet Generation Greta: Young Climate Activists Around the World, The Guardian (June 28, 2019), https://www.theguardian.com/environment/2019/jun/28/generation-greta-young-climate-activists-around-world ..................................................................................13

Jaimie F. Veale et al., *Biological and Psychosocial Correlates of Adult Gender-Variant Identities: New Findings*, 49 Personality & Individual Differences (2010)....................................................................................................................................3

Mihir Zaveri, 'I Need People to Hear My Voice': Teens Protest Racism, The New York Times (June 23, 2020), https://www.nytimes.com/2020/06/23/us/teens-protest-black-lives-matter.html........................................................................................................................13

## INTRODUCTION & INTEREST OF AMICI

As set forth fully in their motion for leave, *Amici curiae* work to advance, empower, and improve the lives of LGBTQ Iowans, including transgender and gender-nonconforming[1] ("TGNC") children and their families. As part of their missions, *amici* are committed to ensuring that TGNC children and young people have access to full educational, social, economic, and other opportunities, and that their mental and physical wellbeing is protected. Schools play a crucial role in TGNC young people's lives.

Over the past several decades, significant academic and medical research[2] has confirmed what *amici*, educational policymakers, and many TGNC people have long known: as compared to the general population, TGNC people and youth face vastly increased and at times deadly risks to their health, safety, and financial security. In addition to significant mental health challenges, TGNC people encounter deeply-rooted social stigmas and hostility that often lead to disturbingly high rates of violence, harassment, and other forms of cruelty and discrimination. This pattern frequently begins as soon as a person first discloses a TGNC identity in childhood or adolescence, and, tragically, hostile family members can be some of the most likely sources of abuse.

Research also confirms, that school environments that support the educational and social needs of TGNC students can dramatically reduce these hardships. This is especially important because of the long-term effects those experiences can have during the crucial developmental stages of a young TGNC person's life. When schools create safe and nurturing spaces for TGNC

---

[1] In this brief, *amici* use the umbrella term "TGNC" to describe a "broadly inclusive" range of gender identities including those outside the male/female binary as assigned at birth. Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psych. 832, 832 n.1 (Dec. 2015), https://www.apa.org/practice/guidelines/transgender.pdf (discussing this term). At times, *amici* also use the term "LGBTQ," a more expansive term referring to lesbian, gay, bisexual, transgender, queer, and other non-heterosexual or gender-diverse persons.

[2] *Amici* have included Internet links to publicly-accessible versions of these primary source materials where available. *Amici* are prepared to submit to the Court and the parties courtesy copies of those documents at the Court's request if doing so would aid in the Court's review.

young people to learn, play, forge bonds, explore, and grow, they can thrive. Considering those objectives—and the need to provide guidance to school personnel—a gender support plan is a critical component of fostering that learning environment. Written policies, guidance documents, and similar tools also help school personnel work with TGNC students to build family acceptance in their homes and avert the well-documented harms caused by familial hostility, rejection, and even violence to their TGNC children.

Linn-Mar Community School District's Board Policy 504.13, "Transgender and Students Nonconforming to Gender Role Stereotypes," and Board Policy 504.13-R, "Administrative Regulations Regarding Transgender and Students Nonconforming to Gender Role Stereotypes," (the "Administrative Policies") are designed to achieve those compelling objectives. *See generally* Exs. 1-3 to D. Resistance to Pl. Mot. for a Prelim. Inj., ECF No. 17. With these facts in mind, *amici* describe the context of TGNC young people's lives and respectfully urge this Court to deny Plaintiff's Motions for a Preliminary Injunction.

## ARGUMENT

### I.  GENDER IDENTITY OFTEN DEVELOPS AT AN AGE WHEN SCHOOL ENVIRONMENTS ARE CRITICALLY IMPORTANT.

Gender identity is a person's "deep internal sense of being female, male, a combination of both, somewhere in between, or neither." Jason Rafferty, Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 2 tbl.1, 142(4) Pediatrics (Oct. 2018).[3] Scientific evidence suggests that gender identity depends closely on biological and genetic factors. *See, e.g.*, Milton Diamond, *Transsexuality Among Twins: Identity Concordance, Transition, Rearing, and Orientation*, 14

---

[3] https://pediatrics.aappublications.org/content/142/4/e20182162.

Int'l J. Transgenderism 24, 30-31 (2013); Jaimie F. Veale et al., *Biological and Psychosocial Correlates of Adult Gender-Variant Identities: New Findings*, 49 Personality & Individual Differences 252 (2010). As such, it is unsurprising that children often begin to express and articulate their gender identity at an early age—a fact acknowledged by the American Psychiatric Association's Diagnostic & Statistical Manual, the gold standard in mental health care diagnostics. Am. Psychiatric Ass'n, *Gender Dysphoria*, Diagnostic & Statistical Manual, ch. 17 (5th ed. 2013). Thus, many TGNC people start exploring and recognizing their gender identities at an age when their school environment plays a vital role in their life and development.

## II.  TGNC YOUTH FACE INCREASED RISKS IN A VARIETY OF AREAS, MAKING SUPPORTIVE SCHOOL ENVIRONMENTS VITAL TO THEIR SAFETY AND SUCCESS.

Students spend a substantial portion of their waking hours at school, and even more if they participate in school-sponsored activities that meet outside regular class hours. *See, e.g.*, Iowa Code § 256.7(19) (requiring school days to include a minimum of six instructional hours for students in grades one through twelve). Schools offer children the opportunity to learn important social skills and to cultivate responsibility, accountability, and independence. *See* Joseph A. Durlak et al., *The Impact of Enhancing Students' Social and Emotional Learning: A Meta-Analysis of School-Based Universal Interventions*, 82 Child Dev. 405, 417-19 (Jan./Feb. 2011). At the same time, students discover, develop, and pursue their passions—intellectual, social, athletic, artistic, and otherwise—in school. *See* Pa. State Univ., *Improving Social Emotional Skills in Childhood Enhances Long-Term Well-Being and Economic Outcomes*, 5-7 (2017).[4] Those benefits are amplified—or diminished—depending on the level of inclusiveness of the school environment. To help their students fully realize these myriad opportunities, schools thus have a compelling and independent interest in, and, indeed, a responsibility for, making their learning environments as

---

[4] https://www.rwjf.org/content/dam/farm/reports/issue_briefs/2017/rwjf438495.

supportive as possible for all and in ensuring every student's wellbeing. *See, e.g.*, Ctrs. for Disease Control & Prevention, *School Connectedness: Strategies for Increasing Protective Factors Among Youth*, 7 (2009) (discussing importance of "[a] positive school environment . . . characterized by caring and supportive interpersonal relationships; opportunities to participate in school activities and decision-making; and shared positive norms, goals, and values.").[5] Indeed, supportive school environments improve health outcomes for *all* students and significantly reduce the likelihood that students will engage in risky behavior, no matter their gender identity. *Id.*

Supportive schools and their protective, nurturing influence are important to any child, but all the more so for TGNC students, who face outsized risks of all kinds, from bullying to isolation to pernicious self-doubt. The statistics regarding the challenges for LGBTQ students—and TGNC students specifically—paint a clear and troubling picture for policymakers and administrators.

### A.    Mental health issues are endemic among TGNC young people.

Due to the challenges of living in a culture in which they are often marginalized, mental health risks among LGBTQ and TGNC young people are significantly higher than the general population.[6] Studies consistently show that TGNC youth experience depression, disordered eating, and self-harm at far higher rates than their non-transgender peers. Maureen D. Connolly et al., *The Mental Health of Transgender Youth: Advances in Understanding*, 59 J. Adolescent Health 489, 491-93 (2016). Consistent with these findings, over 60% of TGNC youth surveyed in a major 2020 study reported engaging in self-harm in the preceding twelve months. *See* The Trevor Project, *National Survey on LGBTQ Youth Mental Health*, 3 (2020) (hereinafter "*2020 National Survey*").[7]

---

[5] https://www.cdc.gov/healthyyouth/protective/pdf/connectedness.pdf.
[6] Being TGNC is not a "mental disorder." Am. Psych. Ass'n, "Gender Dysphoria Diagnosis," https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis.
[7] https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Trevor-Project-National-Survey-Results-2020.pdf.

A similar proportion had experienced symptoms of major depressive disorder in the preceding **two weeks**. *Id.* And these serious issues often go untreated. About *half* of all LGBTQ youth reported that they wanted help from a mental health professional, but had been unable to receive it over the past year, whether due to their parents' refusing to give permission, their inability to afford care, or other reasons. *Id.* at 4.

Perhaps as a result, suicide rates among TGNC children and adolescents are devastating. Transgender youth are 2.71 times more likely to attempt suicide than other young people. Kasey B. Jackman et al., *Suicidality among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior Survey Data*, 11 tbl.4, Archives of Suicide Research (2019) (hereinafter "*Suicidality*"). A staggering 40% of LGBTQ survey respondents seriously considered attempting suicide in the past twelve months; that number was even higher among TGNC youth, over half of whom had seriously considered suicide. *2020 National Survey*, *supra* at 5, at 2. More than 20% of TGNC respondents had in fact attempted suicide in the same time period. *Id.* at 3.

**B.    TGNC young people are frequent victims of bullying, abuse, and violence, including at school.**

TGNC people experience widespread physical abuse, harassment, and sexual violence throughout their lives. Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, 199 (2016) (hereinafter "*2015 Transgender Survey*") ("Nearly half (48%) of respondents reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year.")[8]; *see also* Rebecca L. Stotzer, *Violence against transgender people: A review of United States data*, 14 Aggression & Violent Behavior 170 (2009). The story is no better for TGNC youth, a full 40% of whom report that they have been

---

[8] https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

physically threatened or harmed in their lifetimes due to their gender identity. *2020 National Survey*, *supra* at 5, at 7.

Schools, far from being safe havens from this abuse, can be especially hostile environments for TGNC students absent strong measures to affirm and protect them. TGNC students are 1.66 times more likely to be bullied at school than their non-transgender peers, 2.43 times more likely to be electronically bullied, and 4.15 times more likely to be threatened or injured with a weapon at school. *Suicidality*, *supra* at 5, at 7 tbl.2. Correspondingly, they are 2.65 times more likely to miss school due to feeling unsafe. *Id.*; *see also* Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, xviii (2020) (hereinafter "*National School Climate Survey*") (reporting that 59.1% of LGBTQ students felt unsafe at school, and that nearly a third reported missing at least one day of school in the past month because they felt uncomfortable or unsafe).[9] These are significant harms, but most LGBTQ students never report these incidents of harassment or assault to school faculty or administrators—often because they are afraid that staff will ignore the problem, make it worse, or even blame the student for the perpetrator's actions. *Id.* at 32-33.

### C. Supportive and welcoming schools can make a real difference in TGNC young people's lives.

Just as unsupportive schools can be crucibles for further abuse and victimization of TGNC students, the evidence shows that when schools enact policies designed to support their gender-diverse students, the risks those students face both in and out of school decline dramatically. Campus policies and guidance regarding bullying and harassment, teacher and administrative training, student club support, and curricula materially decrease these risks both at home and at school. Studies conclude, for instance, that "school-based interventions to reduce bullying and

---

[9] https://www.glsen.org/sites/default/files/2020-11/NSCS19-111820.pdf.

increase feelings of safety in the school setting" among TGNC students can provide strong protection against depression and suicide. *Suicidality*, *supra* at 5, at 13. By training faculty, providing students information and support in expressing their gender identity at school, and developing curricula that highlight sexual orientation and gender identity, schools can curb the frequency of harassment and bullying and cultivate "[g]reater feelings of safety" among their LGBTQ students. Molly O'Shaughnessy et al., Cal. Safe Schs. Coal., *Safe Place to Learn: Consequences of Harassment Based on Actual or Perceived Sexual Orientation and Gender Non-Conformity and Steps For Making Schools Safer*, 17 (Jan. 2004)[10]; *see also* Russell B. Toomey et al., *Gender-Nonconforming Lesbian, Gay, Bisexual, and Transgender Youth: School Victimization and Young Adult Psychosocial Adjustment*, 46 Developmental Psychology 1580, 1586 (2010) ("Enactment of school policies that specifically prohibit victimization due to LGBT status, gender nonconformity, and other types of bias-related harassment can help reduce negative psychosocial outcomes in LGBT and gender-nonconforming young people."). Even a move as simple as ensuring that others address students by their appropriate pronouns correlates closely with far lower rates of discrimination, psychological distress, and attempted suicide. *National School Climate Survey*, *supra* at 6, at 82; *2020 National Survey*, *supra* at 5, at 9; Stephen T. Russell at al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. Adolescent Health at 503, 505 (2018).

Similarly, students at schools that foster strong allyship with LGBTQ structures and have policies that bring in support from both peers and adults, such as gay-straight alliances, report greater support from faculty and a broader range of friendships with people across gender and sexual identities. Tina Fetner & Athena Elafros, *The GSA Difference: LGBTQ and Ally*

---

[10] http://www.casafeschools.org/SafePlacetoLearnLow.pdf.

*Experiences in High Schools with and without Gay-Straight Alliances*, 4 Soc. Sci. 563, 569-70 (Aug. 7, 2015) (hereinafter "*GSA Difference*")[11]; Carolyn Porta et al., *LGBTQ Youth's Views on Gay-Straight Alliances: Building Community, Providing Gateways, and Representing Safety and Support*, 87 J. Sch. Health 489, 495 (2017). Students in schools without these structures, by contrast, felt a greater sense of isolation, withdrawal, and even open hostility from classmates and school employees. *GSA Difference*, *supra* at 7, at 570-71.

Supportive school policies, practices, and guidelines can dramatically improve TGNC students' quality of life not just during childhood and adolescence, but long into adulthood. Socially transitioned TGNC youth who are supported in their gender identity have developmentally normal levels of depression and only minimal elevations in anxiety, suggesting that supportive environments play an indispensable role in promoting mental health among the TGNC community. *See* Kristina R. Olson, et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics 1 (Mar. 2016).[12] Indeed, a longitudinal study of transgender adults who began their transition during adolescence enjoyed mental health outcomes similar to—or better than—that of comparable non-transgender young adults. *See* Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 *Pediatrics* 696 (Oct. 2014).[13] In short, the evidence confirms that schools are critical to ensuring that TGNC young people have the opportunity to live fully-realized and healthy lives.

---

[11] https://www.mdpi.com/2076-0760/4/3/563/htm.
[12] https://pediatrics.aappublications.org/content/137/3/e20153223.
[13] https://pediatrics.aappublications.org/content/134/4/696.

**III.    IN THE WRONG CIRCUMSTANCES, TGNC YOUTH FACE SEVERE RISKS FROM UNSUPPORTIVE OR HOSTILE FAMILY MEMBERS.**

A TGNC young person's home environment, like their school environment, has a significant effect on their health, safety, and happiness. When parents and family support and nurture TGNC youth alongside school administrators, their acceptance stands as a bulwark against many of the negative outcomes that TGNC people might otherwise face. Parental support is "significantly associated with higher life satisfaction . . . and fewer depressive symptoms" among TGNC people. Lisa Simons et al., *Parental Support and Mental Health Among Transgender Adolescents*, 53 J. Adolescent Health 791, 792 (2013)[14]; *see also Suicidality*, *supra* at 5, at 10 (noting that "parental support of youth's gender minority identity" is a protective factor against higher risks of suicide). Similarly, relatives can dramatically improve a TGNC young person's life if they are able and willing to fund gender-affirming healthcare, legal assistance, and other resources that support a young person's transition. Jack Andrzejewski et al, *Perspectives of Transgender Youth on Parental Support: Qualitative Findings from the Resilience and Transgender Youth Study*, 48 Health Educ. & Behavior 74, 77-78 (2021) (hereinafter "*Parental Support*").

In contrast, a substantial body of research shows that hostile and unsupportive families present real threats to TGNC people. The odds of such hostility are high: 40% of TGNC survey respondents reported that their families were not supportive of their gender identity. *2015 Transgender Survey*, *supra* at 5, at 65. And these unsupportive environments are consistently and demonstrably dangerous. TGNC people are significantly more likely than non-TGNC people to experience physical, psychological, and sexual abuse from an immediate family member. Andrea L. Roberts et al., *Childhood Gender Nonconformity: A Risk Indicator for Childhood Abuse and*

---

[14] https://pubmed.ncbi.nlm.nih.gov/24012067/.

*Posttraumatic Stress in Youth*, 129 Pediatrics 410, 413-14 (Mar. 2012)[15]; *see also 2015 Transgender Survey*, *supra* at 5, at 65 (reporting that one in ten TGNC survey respondents had been the victim of violence at the hands of an immediate family member).

Parents and relatives are also the most likely source of pressure for young LGBTQ people to undergo so-called "conversion therapy" aimed at altering their gender identity or sexual orientation, *2020 National Survey*, *supra* at 5, at 5, which the American Medical Association describes as "clinically and ethically inappropriate" and has been rejected by "[a]ll leading professional medical and mental health associations . . . as a legitimate medical treatment," Am. Med. Ass'n, *LGBTQ change efforts (so-called "conversion therapy")*, 3 (2019).[16] Twenty-one states and many more local governments—including Linn County—prohibit licensed health workers from practicing conversion therapy on minors. Linn County Ordinance No. 10-6-2022[17]; *see also* The Trevor Project, "CT Map," https://www.thetrevorproject.org/ending-conversion-therapy/ (last visited Sept. 01, 2022) (cataloging laws banning conversion therapy).

Hostile family members may also deny TGNC youth financial support, housing, and education, or deprive them of other key resources needed to keep them from harm's way. Nearly 40% of TGNC individuals reported that after their family learned of their gender identity, they either ran away from home or their family kicked them out of the house. *2020 National Survey*,

---

[15] https://pediatrics.aappublications.org/content/pediatrics/129/3/410.full.pdf.

[16] https://www.ama-assn.org/system/files/2019-12/conversion-therapy-issue-brief.pdf. In light of the serious dangers associated with this unscientific practice, every leading medical and mental health organization has adopted the position that efforts to change a young person's sexual orientation or gender identity are closely linked with a broad range of negative health outcomes both during adolescence and into adulthood, such as higher risks of suicide attempts, depression, and substance abuse. Am. Med. Ass'n, *LGBTQ change efforts (so-called "conversion therapy")*, at 3; Am. Psychiatric Ass'n, Position Statement on Conversion Therapy and LGBTQ Patients, at 1; Caitlin Ryan et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment*, 2, 10 & tbl.3, J. Homosexuality (Nov. 7, 2018).

[17] Because Ordinance No. 10-6-2022 applies only to Linn County's licensed, certified, or registered providers, unsupportive parents may still force their children into programs run by those who are not licensed, certified, or registered (and thus beyond the reach of the county ordinance) or out-of-county providers.

*supra* at 5, at 8; *see also 2015 Transgender Survey*, *supra* at 5, at 68 ("Within an hour of coming out to my parents, I was kicked out into the cold with very few items and my car taken away. I was soon informed by my college that my parents had withdrawn my tuition for the upcoming spring semester. I was devastated."). Among TGNC people rejected by their immediate family, 40% went on to experience homelessness, a figure twice as high as for those with supportive families. *2015 Transgender Survey*, *supra* at 5, at 65. Even when family members do not cut off financial support entirely, they can use that support as leverage over their TGNC children's gender identities. As one TGNC young person put it, she was "[s]till at present financially dependent on my parents, which allows for a lot of coercion and policing of where I can be out and in what capacity I can be out, and a lot of need for hiding different things." *Parental Support*, *supra* at 9, at 77-78.

These kinds of familial rejection and abuse only increase the already high risks, discussed above, that TGNC people face in adolescence and throughout their lives. TGNC people rejected by their family members are over 300% more likely to attempt suicide, and about 250% more likely to suffer substance abuse problems. Augustus Klein & Sarit A. Golub, *Family Rejection as a Predictor of Suicide Attempts and Substance Misuse Among Transgender and Gender Nonconforming Adults*, 3 LGBT Health 193, 196 tbl.1 (2016). Likewise, 38% of LGBTQ youth who experienced housing instability—often prompted by hostile family members—reported attempting suicide. *2020 National Survey*, *supra* at 5, at 8. Even when these most dire outcomes do not occur, a TGNC young person's perception of parents as unsupportive or rejecting is generally "linked to psychological maladjustment, including higher levels of depressive symptoms and LGBTQ-identity disclosure stress." Arnold H. Grossman et al., *Parental Responses to*

*Transgender and Gender Nonconforming Youth: Associations with Parent Support, Parental Abuse, and Youths' Psychological Adjustment*, 12-13, J. Homosexuality (Nov. 27, 2019).

Given these statistics, it is undeniable that when a TGNC student has reason to believe that their family may react with hostility to their gender identity, non-consensual disclosures to their families can be profoundly damaging and even fatal. In scenarios like these, it is crucial that school faculty and administrators retain discretion to evaluate whether familial disclosure of a TGNC student's gender identity could be a dangerous misstep, and to work with the student to build family acceptance in a manner that avoids those very serious harms. To do otherwise would place TGNC students in a perverse catch-22 where, by seeking support at school, they would risk exposing themselves to rejection or abuse at home. *See National School Climate Survey*, *supra* at 6, at 22-23 (reporting on student reluctance to seek school support for fear that school employees will "out" them to family members). That outcome could deny these young people all the important, consequential, and documented benefits that supportive school policies are specifically designed to provide.

## IV. APPROPRIATE ANTI-BULLYING AND HARASSMENT POLICIES PROTECTING TRANSGENDER STUDENTS' EQUAL PROTECTION AND CIVIL RIGHTS ARE NOT A FACIAL VIOLATION OF THE FIRST AMENDMENT

Those who oppose "safe schools" policies that prohibit bullying and harassment of students on the basis of sexual orientation or gender identity—in addition to race, religion, and the other categories protected by state and federal civil rights laws—have long argued that they are incompatible with protections for students' free speech at school. But these rights are compatible. Appropriate policies recognize both that harassment and bullying of students impede the core purpose of every school to facilitate learning—and that censorship, too, contradicts this function.[18]

---

[18] Not only do children have a strong interest in speaking and being heard, but both children and adults have a strong interest in hearing what children have to say. *See, e.g.*, Kait Sanchez, How a Teen Punk Led a Movement for

These principles are neither new nor unique to expression related to gender identity or sexual orientation. As numerous federal courts have recognized, schools must protect the equal protection right, civil rights, *and* free speech of students.

Plaintiff's arguments rest on inapposite cases outside of the governing *Tinker* analysis and speculative claims about how the school *could* apply the facially permissible policy in the future. This court should deny preliminary injunctive relief on free speech grounds.

A. **Schools May Appropriately Regulate Student Speech to Prevent Bullying and Harassment under *Tinker*.**

*Tinker* and related school speech cases provide the legal framework governing the analysis of Plaintiff's facial speech claims. Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Yet "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986)); *see also Mahanoy Area School District v. B. L. by & through Levy*, 141 S. Ct. 2038, 2044-45 (2021) (affirming that "minors are entitled to a significant measure of First Amendment protection," and that the special characteristics of school "call for special leeway

Disabled People Online, The Verge (July 27, 2021), https://www.theverge.com/22583848/disabled-teen-cripple-punk-media-representation; @jew.shua, Instagram (July 25, 2020), https://www.instagram.com/p/CDFLe7PHPfK/ (kid-created viral guide on trans-inclusive language); Mihir Zaveri, 'I Need People to Hear My Voice': Teens Protest Racism, The New York Times (June 23, 2020), https://www.nytimes.com/2020/06/23/us/teens-protest-black-lives-matter.html; Anna Turns, Meet Generation Greta: Young Climate Activists Around the World, The Guardian (June 28, 2019), https://www.theguardian.com/environment/2019/jun/28/generation-greta-young-climate-activists-around-world; *see also Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 795, n.3 (2011) (discussing First Amendment rights of minors to attend "a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors").

when schools regulate speech that occurs under its supervision."); *Morse v. Frederick*, 551 U.S. 393, 394 (2007) (recognizing that "'the nature of those rights is what is appropriate for children in school'") (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995)). With the exception of some enumerated categories of speech which the Court has held are unprotected from any heightened First Amendment scrutiny at school,[19] schools' regulation of student speech in-school or during school-supervised activities[20] is subject to the general *Tinker* rule: student speech is protected from regulation except when it would substantially disrupt school operations, or it would "impinge upon the rights of other students." *Tinker,* 393 U.S. at 506, 509, 513.

In meeting their burden to justify speech restrictions under *Tinker*, schools may rely on reasonable forecasting of a substantial disruption or interference with the rights of others, rather than waiting for such harms to occur. *See, e.g., B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 738-39 (8th Cir. 2009) (school "could reasonably 'forecast' a 'substantial disruption' resulting from any display of the Confederate flag," based on previous racial incidents)(quoting *Tinker*, 393 U.S. at 514); *Lowery v. Euverard,* 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place."); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 767 n.17 (9th Cir. 2006)("*Tinker* does not require school officials to wait until disruption or interference actually occurs before suppressing student speech, nor does it require certainty that disruption will occur.").

---

[19] These are the promotion of illegal drug use, vulgarity, and school-sponsored speech. *See Mahanoy*, 141 S. Ct. at 2045 (summarizing *Morse*, 551 U.S. at 409; *Hazelwood*, 484 U.S. at 271; *Bethel*, 478 U.S. at 685). Other cases address student speech categorically unprotected by the First Amendment, whether uttered by adults or kids in school, like true threats. *See, e.g., D.J.M. v. Hannibal Public Sch. Dist. No. 60*, 647 F.3d 754, 762-66 (8th Cir. 2011).

[20] *Mahanoy* makes clear that schools cannot simply extend their in-school authority under *Tinker* to off-campus speech, where the unique educational characteristics that might call for special Frist Amendment leeway are diminished. *Mahanoy*, 141 S. Ct. at 2045-46. However, *Mahanoy* expressly pointed to *off-campus* bullying, harassment, and threats as the type of speech a school may have sufficient interest in regulating. *Id.* at 2045.

Courts are generally deferential to schools' reasonable forecasts so long as they are actual and not ad hoc, but review schools' reasoning to ensure schools have not restricted speech merely "'to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.'" *See, e.g., B.W.A.*, 554 F.3d at 740 (quoting *Tinker,* 393 U.S. at 509); *see also Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 29 n.18 (1st Cir. 2020) (collecting cases in accord with its determination that "school administrators must be permitted to exercise discretion in determining when certain speech crosses the line from merely offensive to more severe or pervasive bullying or harassment.").

Consistent with this *Tinker* rule, schools may regulate student speech to prevent bullying and harassment that interferes with the rights of other students, or which causes a substantial disruption. *See, e.g., Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 572-73 (4th Cir. 2011), *cert. denied,* 132 S. Ct. 1095 (2012) (holding that plaintiff's speech—creating an online page to ridicule a fellow student—"caused the interference and disruption described in *Tinker* as being immune from First Amendment protection," especially since "school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning"); *Norris*, 969 F.3d at 29 ("[B]ullying is the type of conduct that implicates the governmental interest in protecting against the invasion of the rights of others, as described in *Tinker*."); *C.R. v. Eugene Sch. Dist. 4J,* 835 F.3d 1142, 1152 (9th Cir. 2016) ("Schools therefore must have the authority to discipline students for engaging in sexually inappropriate and harassing speech."); *Doe v. Hopkinton Pub. Sch.*, 490 F. Supp. 3d 448, 457–58 (D. Mass. 2020), *aff'd*, 19 F.4th 493 (1st Cir. 2021) (holding that neither the school's anti-bullying policy nor Massachusetts's anti-bullying law were facially overbroad or impermissibly vague, and finding suspension of students for violating policy did not violate their free speech

rights); *c.f. Mahanoy*, 141 S. Ct. at 2045 (recognizing schools may still have a sufficient interest in the regulation of off-campus speech which is serious or severe bullying or harassment targeting particular individuals).

**B. Appropriate Anti-Bullying and Harassment Policies Protect Students' Equal Protection and Civil Rights**

As demonstrated above, appropriate policies regulating student speech that bullies or harasses other students at school are permissible under *Tinker* and related cases when such speech causes, or is reasonably forecasted to cause, a substantial disruption at school, or interferes with the rights of others—including their constitutional and civil rights. *Tinker*, 393 U.S. at 506. Indeed, as a matter of constitutional and civil rights laws, schools *must* act to stop student harassment based on sexual orientation or gender identity or risk legal liability, and the *Tinker* rule accommodates this.

The constitutional guarantee of equal protection imposes an obligation on schools to treat students equally, regardless of sexual orientation or gender identity. *See generally Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607-08 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (applying heightened scrutiny to transgender student's equal protection challenge to school's restroom policy), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Romer v. Evans*, 517 U.S. 620, 635-36 (1996); *Obergefell v. Hodges*, 576 U.S. 644, 674-76 (2015). Federal courts have ruled that schools can be liable for violating equal protection when they fail to protect lesbian, gay, bisexual, and transgender students from harassment. *See, e.g., Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996); *Flores v. Morgan Hill Unified Sch. District*, 324 F.3d 1130, 1135 (9th Cir. 2003).

Title IX also requires schools to protect students from harassment on the basis of gender identity. *Whitaker*, 858 F.3d at 1049-50; *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741–43 (2020) (recognizing that discrimination against someone because they are transgender is sex discrimination under Title VII); *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (relying on interpretations of Title VII to construe Title IX); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (same); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002) (same); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) (same). In accord with the *Bostock* decision, the U.S. Department of Education has issued official guidance which interprets Title IX's prohibition on discrimination "on the basis of sex" to encompass discrimination on the basis of sexual orientation and gender identity. U.S. Department of Education, Notice of Interpretation, at 4 (June 22, 2021).[21]

State civil rights laws separately require schools to prevent and address bullying and harassment because a student is TGNC. Iowa Code §§ 216.7(1), 216.9; *see also* Iowa Civil Rights Comm'n, *Sexual Orientation, Gender Identity, and Iowa's Safe Schools Law*.[22]

### C.    The Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits in Arguing that the Administrative Policies Are a Facial Violation of Free Speech

The Administrative Policies that Plaintiff challenges do not, on their face, infringe on speech which is exempt from school regulation, because speech which bullies and harasses other students consistent with how those terms are defined by Linn-Mar and Iowa law squarely falls within the ambit of speech interfering with the rights of others or causing a substantial disruption at school. *Tinker*, 393 U.S. at 506. Given the devastatingly high rates of bullying and harassment

---

[21] https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-noi.pdf; *see also* U.S. Dep't of Ed., OCR, First Amendment: Dear Colleague (July 28, 2003), https://www2.ed.gov/about/offices/list/ocr/firstamend.html; U.S. Dep't of Ed., OCR, Dear Colleague (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html; U.S. Dep't of Ed., OCR, Notice of Investigative Guidance, Racial Incidents and Harassment, 59 Fed. Reg. 11448, (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.pdf.
[22] https://icrc.iowa.gov/sites/default/files/publications/2018/SOGI_Education_May18.pdf.

of LGBTQ and TGNC children at school and the resulting harms,[23] Linn-Mar's forecast of those harms is objectively reasonable. Anti-bullying and harassment policies like Linn-Mar's can be found across Iowa schools. Iowa law requires all accredited schools to adopt this policy in substantively similar form. Iowa Code § 280.28.[24]

The Administrative Policies must be read together with Linn-Mar's anti-bullying and harassment policy and the Iowa law requiring its adoption. The challenged Administrative Policies expressly cross-reference this anti-bullying and harassment policy and applicable civil rights laws. ECF 3-11, Ex. I, at 50. To the extent that the gender support plan Administrative Policy regulates student speech at all, it plainly does so only to the extent that such speech violates the anti-bullying and harassment policy. *See Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 358 (8th Cir. 2020) (requiring that policy must be "judged in relation to its plainly legitimate sweep."). Plaintiff does not challenge the Linn-Mar anti-bullying and harassment policy, or the Iowa law requiring its adoption, as exceeding the permissible zone of regulation under *Tinker*.

While it is possible that in the future, the Linn-Mar school district could apply its Administrative Policies in such a way as to exceed the school's stated policy governing discipline for bullying or harassing speech, or regulate speech outside of the zone permissible under *Tinker*, these policies on their face do not do that and there is no evidence in the record at

---

[23] *See* Section I, *supra*.

[24] *Compare* Exs. 5 to Defs.' Resistance to Pl. Mot. for a Prelim. Inj., ECF No. 17, *with* Iowa Dept. of Edu., *Sample Anti-Bullying/Anti-Harassment Policy*, https://educateiowa.gov/sites/files/ed/documents/Anti-Bullying%20Harassment%20Sample%20Policy.pdf. This law—and Linn-Mar's policy—define bullying and harassment narrowly, as any electronic, written, verbal, or physical act or conduct toward a student which is *based on any actual or perceived trait or characteristic* of the student and which creates an *objectively hostile school environment* that meets one or more of the following conditions: (1) Places the student in reasonable fear of harm to the student's person or property; (2) Has a substantially detrimental effect on the student's physical or mental health; (3) Has the effect of substantially interfering with a student's academic performance; (4) Has the effect of substantially interfering with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school. Iowa Code § 280.28(2)(b) (emphasis added).

this early stage of litigation of any such violation. Indeed, Linn-Mar understands its own Administrative Policies as appropriately limited in accord with *Tinker*. ECF 17, at 25 (stating "[i]t does not prohibit any student from expressing personal opinions regarding the general appropriateness of preferred pronouns, biological sex, or other related issues, nor would it restrict general satire, humor, or parody regarding the topic of gender. It simply prohibits discriminatory or harassing treatment of other students on the basis of gender identity."). And the Administrative Policies have never been enforced in such a way as to exceed the school's anti-bullying and harassment policy. ECF 15-5, at 2.

Plaintiff's argument that the fact "[t]hat the Policy regulates public school students is of no moment", and that "courts regularly enjoin public school attempts to violate student speech rights", ECF 21, at 8, inadequately accounts for the *Tinker* rule. As the Court has explained perhaps most simply in *Morse v. Frederick*, "schools may regulate some speech in the school 'even though the government could not censor similar speech outside the school.'" 551 U.S. at 406. In *Morse*, the Court upheld a school's discipline of a student for displaying a "Bong Hits 4 Jesus" banner—normally protected speech—because he displayed it at a school function during school hours. The Court drew this same line when upholding a school's authority to suspend a student for delivering a lewd speech at a required student assembly. *Bethel*, 478 U.S. at 677. As the Court later noted, "had [the student] delivered the same speech in a public forum outside the school context, it would have been protected." *Morse*, 551 U.S. at 405. Plaintiff's citations to numerous cases applying strict scrutiny to restrictions of adult speech and outside of school, *see, e.g.,* ECF, at 9, miss the mark, because they are divorced from the *Tinker* rule that applies to the Plaintiff's claims.

The Plaintiff's reliance on the *Saxe* case to support its arguments, ECF 21, at 8, is also off

the mark, by *Saxe*'s own terms. In *Saxe*, the Third Circuit was careful to say, "We do not suggest, of course, that no application of anti-harassment law to expressive speech can survive First Amendment scrutiny. Certainly, preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209–10 (3d Cir. 2001).[25] *Saxe* in turned in part on the policy's scope, exceeding the categories of civil rights laws to negative comments about "clothing," "appearance," "hobbies and values," and "social skills." *Saxe*, 240 F.3d at 210. But here, the Administrative Policies are narrowly aimed at protecting against interference with the civil and constitutional nondiscrimination rights students have at school, as set forth above.

The right to equal protection, nondiscrimination under state and federal civil rights statutes, and the right to free expression are compatible. Students have a right to say what they think, even if their speech is offensive to others. *See Tinker*, 393 U.S. at 509. That means students have a right to speak about and express their sexual orientation or gender identity, even if their classmates find that disagreeable; likewise, students have a right to voice opposition to civil rights for transgender people in school. But schools do not violate the First Amendment by meeting their obligations to prevent and address student speech that substantially interferes with the rights of a classmate or causes a substantial disruption. The prohibition on bullying and harassment of fellow students, including when effectuated by intentional or repeated misgendering, is not a facial violation of the First Amendment.

## CONCLUSION

For the foregoing reasons, *amici* respectfully urge the Court to deny Plaintiff's Motion.

---

[25] Indeed, the Third Circuit explained the next year that "There is no constitutional right to be a bully ... Students cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir. 2002).

Respectfully submitted:

Rita Bettis Austen, AT0011558
ACLU of Iowa Foundation Inc.
505 Fifth Avenue, Ste. 901
Des Moines, IA 50309-2317
Telephone: 515-207-0567
Facsimile: 515-243-8506
rita.bettis@aclu-ia.org

L. Nowlin-Sohl*
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 206-348-3163
Facsimile: 212-549-2650
lnowlin-sohl@aclu.org

*Pro hac vice application forthcoming

Attorneys for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on September 6, 2022, the above brief was filed using the court's CM/ECF system, which will notify all registered counsel.

Dated: September 6, 2022

Respectfully submitted,
/s/Rita Bettis Austen
Counsel for *Amici*