**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| PARENTS DEFENDING EDUCATION,<br><br>     Plaintiff,<br><br>vs.<br><br>LINN-MAR COMMUNITY SCHOOL<br>DISTRICT et al.,<br><br>     Defendants. | CASE NO.: 22-CV-78-CJW-MAR<br><br><br><br>**DEFENDANTS' ANSWER TO**<br>**PLAINTIFF'S COMPLAINT** |

COME NOW Defendants, Linn-Mar Community School District, Shannon Bisgard, Brittania Morey, Clark Weaver, Barry Buchholz, Sondra Nelson, Matt Rollinger, Melissa Walker, and Rachel Wall (collectively, "the District"), and for their Answer to Plaintiff's Complaint and Jury Demand states as follows:

## INTRODUCTION

1.     Nearly a century of Supreme Court precedent makes two things clear: parents have a constitutional liberty interest in the care, custody, and control of their children, and students do not abandon their First Amendment rights at the schoolhouse gate. The Linn-Mar Community School District is flouting both of these constitutional guarantees through its recent adoption of Policy 504.13-R.

**ANSWER: This paragraph contains Plaintiff's statement of the case and legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

2.     The Policy authorizes children to make fundamentally important decisions concerning their gender identity without any parental involvement and to then hide these decisions from their parents.

**ANSWER: Denied.**

3.      Per the Policy, children can create a "gender support plan" to assist their gender "transition." Through this plan, the District can, among other things, (1) require all employees and students to address the child by a new name; (2) require all employees and students to address the child by a new pronoun; (3) have the child's name changed on numerous government documents, including identification cards, yearbooks, and diplomas; (4) allow the child to use the restrooms, locker rooms, and changing facilities that correspond with the child's gender identity; (5) allow the child to participate in physical education classes, intramural sports, clubs, and other events that correspond with the child's gender identity; and (6) allow the child to room with other students who share the child's gender identity.

**ANSWER:  Admitted that the Policy, consisting of administrative regulations, provided a process for students and families to establish various gender support measures.  The Policy speaks for itself and this paragraph is otherwise denied. For further response, the District states that the goal of the Policy was to "ensure a safe, affirming, and healthy school environment where every student can learn effectively."**

4.      These actions can happen without *any knowledge or input* from the child's parents.  Instead, these decisions will be made solely by the child and "school administrators and/or school counselors."

**ANSWER:  Denied.**

5.      And it is not just secrecy through silence. The District will withhold this information even if it is specifically requested by parents. Under the Policy, the District will not tell parents whether their child has requested a Gender Support Plan, whether the child has made requests concerning their gender identity, or any other information that would reveal the child's

"transgender status." Parents are completely and purposely left in the dark. The Policy plainly violates parents' rights under the Fourteenth Amendment.

**ANSWER: Denied.**

6.     Linn-Mar has displayed a similar disregard for students' First Amendment rights. The Policy punishes students for expressing their sincerely held beliefs about biological sex and compels them to affirm the beliefs of administrators and their fellow students. Specifically, the Policy prohibits speech that doesn't "respect a student's gender identity" and "misgendering," which is defined as "intentionally or accidentally us[ing] the incorrect name or pronouns to refer to a person." This speech code blatantly violates the First and Fourteenth Amendments.

**ANSWER:  Admitted that the Policy stated that "[a]n intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies 103.1 Anti-Bullying and Anti-Harassment, 104.1 Equal Educational Opportunity, and 104.3 Prohibition of Discrimination and/or Harassment Based on Sex per Title IX." The Policy also defined "misgendering" and stated that "[r]epeated or intentional misgendering is a form of bullying and harassment."  This paragraph is otherwise denied.**

7.     PDE brings this action to protect parents' rights to raise their children and students' rights to freedom of expression.

**ANSWER:  Denied for lack of information.**

**PARTIES**

8.     Plaintiff PDE is a nationwide, grassroots membership organization whose members include parents, students, and other concerned citizens. PDE's mission is to prevent—through advocacy, disclosure, and, if necessary, litigation—the politicization of K-12 education.

**ANSWER: Denied for lack of information.**

9.       PDE's members include parents who live in the Linn-Mar district and whose children are enrolled in Linn-Mar public schools.

**ANSWER: Denied for lack of information.**

10.      Defendant Linn-Mar Community School District is the public school district for Linn- Mar, Iowa. It provides K-12 public education services for more than 7,600 students. Linn-Mar operates seven elementary schools, two intermediate schools, two middle schools, and one high school.

**ANSWER: Admitted.**

11.      Defendant Shannon Bisgard is the Superintendent of Linn-Mar Community School District. In that role, Bisgard is responsible for the oversight and enforcement of all Linn-Mar policies, including the Policy challenged here. Bisgard is sued in his official capacity.

**ANSWER:  Denied. For further response, the District states that Shannon Bisgard is the former Superintendent of the District. Superintendent Bisgard retired at the conclusion of the 2022-2023 school year. Amy Kortemeyer now serves as the District's Superintendent.**

12.      Defendants Brittania Morey, Clark Weaver, Barry Buchholz, Sondra Nelson, Matt Rollinger, Melissa Walker, and Rachel Wall are members of the Linn-Mar School Board. The Board Defendants are responsible for the enactment and oversight of all Linn-Mar policies, including the Policy challenged here. The Board Defendants are sued in their official capacities.

**ANSWER: Admitted.**

## JURISDICTION AND VENUE

13.       This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

4

**ANSWER: Admitted that Plaintiff purports to bring such claims.**

14. The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

**ANSWER: Admitted that the Court has the subject matter jurisdiction as set forth in the cited statutes. Denied that such subject matter jurisdiction exists over Plaintiff's claims.**

15. Venue is proper under 28 U.S.C. §1391 because Linn-Mar resides here and a substantial part of the events or omissions giving rise to the claims occurred here.

**ANSWER: Admitted that venue is proper in this Court. This paragraph is otherwise denied.**

## FACTUAL ALLEGATIONS

### I. The Growing Movement to Exclude Parents from Decisions Concerning Gender Identity

16. "[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). Children are "not the mere creature of the state," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and the "right[] … to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil rights of man,'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are rooted in the "historical[] … recogni[tion] that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (citing 1 W. Blackstone, Commentaries, 447; 2 J. Kent, Commentaries on American Law, 190).

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

17. Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the

state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65-66 (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972).

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

18.     The right of parental control is particularly strong in circumstances involving "fundamental values" and "intimate decision[s]." *Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*, 880 F.2d 305, 313 (11th Cir. 1989) (parents' rights protect "the opportunity to counter influences on the child the parents find inimical to their religious beliefs or the values they wish instilled in their children"); *see also H. L. v. Matheson*, 450 U.S. 398, 410 (1981) (parents' rights "presumptively include[ ] counseling [their children] on important decisions"). In such circumstances, parents are presumed to be fit to make decisions for their children absent strong evidence to the contrary. *See Parham*, 442 U.S. at 602- 03.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

19.     The Supreme Court has paid special attention to the rights of parents "in cases involving parent-state conflicts in the areas of medical care and education." *Arnold*, 880 F.2d at 312-13. Indeed, "[i]t is not educators, but parents who have primary rights in the upbringing of children.  School officials have only a secondary responsibility and must respect these rights." *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). "Public schools must not forget that '*in loco parentis*' does not mean displace parents." *Id.*

**ANSWER: This paragraph contains legal argument, not facts to be admitted or**

denied. To the extent a response is required, denied.

20. A child's gender identity implicates the most fundamental issues concerning the child, including the child's religion, medical care, mental health, sense of self, and more. Yet despite "extensive precedent" that parents must be involved in decisions concerning these types of issues, *Troxel*, 530 U.S. at 66 (listing cases), school districts across the country are increasingly excluding parents from decision-making when gender identity is involved. "In the past few years, school districts nationwide have quietly adopted policies requiring staff to facilitate and 'affirm' gender identity transitions at school without parental notice or consent—and even in secret from parents." Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, 1, American Enterprise Institute, (Mar. 2022), https://bit.ly/39s1GQF.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

21. A school district in Wisconsin, for example, recently instructed teachers that "parents 'are not entitled to know their kids' identities' and that 'this knowledge must be earned.'" *Id.* at 2. One mother in California "went two years without knowing her sixth grader had transitioned at school." Donna St. George, *Gender Transitions At School Spur Debates Over When, Or If, Parents Are Told*, The Washington Post, (July 18, 2022), https://wapo.st/3bkEeWt. "Basically, I was the last one to find out," said the mother. *Id.* "They were all saving my kid from me." *Id.* The mother only made the discovery "when she took her child to the hospital one day and a doctor told her. She was stunned." *Id.*

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

22. Under parental exclusion policies, "[e]ducators and staff," not parents, "work

closely with the student to determine what changes are necessary . . . to ensure their safety and well-being." GLSEN & National Center for Transgender Equality, *Model Local Education Policy on Transgender and Non-Binary Students*, 7-8 (Sept. 2018), https://bit.ly/3PHTyv9. Often, that process is formalized in a "Gender Support Plan" created by the school for the child.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

23.     These exclusionary policies are not just unconstitutional; they are harmful to both parents and children. "Parents across many political beliefs argue that they can't be supportive if no one tells them that their child came out." St. George, *supra*. According to Erica Anderson, a clinical psychologist who identifies as a transgender woman and is the former president of the U.S. Professional Association for Transgender Health, "leaving parents in the dark is not the answer." *Id*. "If there are issues between parents and children, they need to be addressed." *Id*. Such secrecy "only postpones . . . and aggravates any conflict that may exist." *Id*. In a world in which schools "routinely send notes home to parents about lesser matters," such as "playground tussles, missing homework, and social events," there is absolutely no justification for withholding such fundamentally important information from their parents. *Id*.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

24.     Parental exclusion policies pose significant risks for parents of children on the autism spectrum in particular. Children on the spectrum are far likelier to identify as transgender or non- binary than other children. *See, e.g.*, Varun Warrier, et al., *Elevated Rates of Autism, Other Neurodevelopmental and Psychiatric Diagnoses, and Autistic Traits in Transgender and Gender-Diverse Individuals*, (Aug. 2020), https://bit.ly/3QUc3Oa. Strong    parent-child

relationships are critical for their development.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

25. Parental exclusion policies "run[] directly against a strong body of case law recognizing parents' constitutional rights to raise their children." Berg, *supra*, at 2. Nevertheless, they have proliferated to school districts across the country, including Linn-Mar.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

## II. The First Amendment Rights of Students in Public Schools

26. Public-school students have First Amendment rights, and those rights do not disappear "at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Because "America's public schools are the nurseries of democracy," students must be free to express their opinions, even if their views are "unpopular." *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038, 2046 (2021). Protecting unpopular speech in public schools "ensur[es] that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.*

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

27. Despite these well-established rights, schools often seek to stamp out controversial student expression. Speech codes are the tried-and-true method of suppressing unpopular student speech. They prohibit expression that would otherwise be constitutionally protected. *See* Foundation for Individual Rights in Education, *Spotlight on Speech Codes 2021*, 10, https://bit.ly/3pdQ09E. Speech codes punish students for undesirable categories of speech

such as "harassment," "bullying," "hate speech," and "incivility." *Id.* Because these policies impose vague, overbroad, content-based (and sometimes viewpoint-based) restrictions on speech, federal courts regularly strike them down. *Id.* at 10, 24; *Speech First v. Fenves*, 979 F.3d 319, 338-39 n.17 (5th Cir. 2020) (collecting "a consistent line of cases that have uniformly found campus speech codes unconstitutionally overbroad or vague").

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

28.     Schools are increasingly adopting speech codes regarding gender identity to compel students to affirm beliefs they do not hold and that are incompatible with their deeply held convictions. So-called "preferred pronouns policies" are an increasingly used method of compelling student speech. "Preferred pronoun policies" subject students to formal discipline for referring to other students according to the pronouns that are consistent with their biological sex rather than their gender identity. Under these types of policies, a student who uses "he" or "him" when referring to a biological male who identifies as a female will be punished for "misgendering" that student. *See, e.g.*, Rick Esenberg & Luke Berg, *The Progressive Pronoun Police Come for Middle Schoolers*, The Wall Street Journal, (May 23, 2022), https://on.wsj.com/3NTV50b.

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

### III.     The District's Parental Exclusion and Speech Policy – Policy 504.13-R

29.     On April 25, 2022, over fierce opposition from parents, the Linn-Mar School Board adopted Policy 504.13-R, entitled "Administrative Regulations Regarding Transgender and Students Nonconforming to Gender Role Stereotypes." *See* Exhibit A.

**ANSWER: Admitted that on April 25, 2022, the District adopted the Policy. Some**

parents expressed opposition to the adoption of the Policy and other parents expressed support for the adoption of the Policy.

30. The Policy is designed to do three things: (1) effectuate students' "gender transition" requests; (2) keep the District's actions secret from the student's parents; and (3) punish other students who do not use a student's preferred pronouns when speaking.

**ANSWER: Denied.**

A. **The District's Policy on Gender Identity Transitions**

31. Policy 504.13-R gives "[a]ny student, regardless of how they identify," the right to meet with a school administrator or school counselor to create and implement a "Gender Support Plan." A Gender Support Plan is defined as a "document that may be used to create a shared understanding about the ways in which a student's gender identity will be accounted for and supported at school."

**ANSWER: Admitted that the Policy provided that "[a]ny student, regardless of how they identify, may request to meet with a school administrator and/or school counselor to receive support from the school and implement a Gender Support Plan." Admitted that the Policy defines "Gender Support Plan" as stated above.**

32. When a student requests a Gender Support Plan, the school "will hold a meeting with the student within 10 school days of being notified about the request." The student's parents have no right to participate in this meeting or to even know that it is happening. The Policy states that "[t]he student should agree with who is a part of the meeting, including whether their parent/guardian will participate." It also specifies that the student "will have priority of their support plan over their parent/guardian."

**ANSWER: Admitted that the Policy provided that when a student requests a Gender Support Plan, the school "will hold a meeting with the students within 10 school days of**

being notified about the request" and that the Policy stated that "[t]he student should agree with who is a part of the meeting, including whether their parent/guardian will participate." This paragraph is otherwise denied.

33.     Students can use their Gender Support Plan to make critically important decisions about their identity, health, and education, and the District will agree to them without any parental involvement or notification. In particular, the student can choose to:

• Be addressed by all school employees and students by a new name. The Policy states that "[e]very student has the right to be addressed by a name . . . that corresponds to their gender identity."

• Have their name changed for all "logins, email systems, student identification cards, non- legal documents such as diplomas and awards, yearbooks, and at events such as graduation."

• Be addressed by all school employees and students by a new pronoun. The Policy states that "[e]very student has the right to be addressed by a . . . pronoun that corresponds to their gender identity."

• Use restrooms, locker rooms, and changing facilities that correspond to the student's gender identity, rather than their biological sex.

• Participate in "physical education classes, intramural sports, clubs, and school events in a manner consistent with their gender identity."

• Be allowed to "room with other students who share their gender identity" on overnight fieldtrips.

**ANSWER: Admitted that the Policy identified the above measures as potential options for a student's Gender Support Plan. This paragraph is otherwise denied.**

34.     While students can make these requests through a Gender Support Plan, they need not go through this process to make these requests and have them granted by the District.

**ANSWER: Denied for lack of information.**

**B.     The District's Exclusion of Parents from Gender-Identity Decisions**

35.     The Policy prevents parents from having knowledge or control over their child's

decisions involving gender identity. According to the Policy, "[a]ny student in seventh grade or older will have priority of their support plan over their parent/guardian," and parents have no right to know about or be "a part of the meeting" to develop a Gender Support Plan. Decisions regarding a student's gender identity will be made "regardless of age."

**ANSWER: Admitted that the Policy provided that "[a]ny student in seventh grade or older will have priority of their support plan over their parent/guardian." This paragraph is otherwise denied.**

36. Importantly, the District will not tell parents whether their child has requested or been given a Gender Support Plan, whether the child has made requests or actions have been taken concerning their gender identity, or whether it has any other information that would reveal the child's "transgender status." Indeed, the Policy openly encourages children to deceive their parents by hiding the name and pronouns that they are using at school.

**ANSWER: Denied.**

37. The Policy further requires that a student's Gender Support Plan and "all written records related to student meetings concerning their gender identity and/or gender transition" must be maintained in a "temporary file" that shall be "maintained by the school counselor."

**ANSWER: Admitted.**

38. The Policy defines "gender identity" and gender "transition" broadly to include a host of important information about a child, including "social, medical, and/or legal" information concerning any transition. These "temporary" records "will only be accessible to staff members that the student has authorized in advance to do so."

**ANSWER: Admitted.**

**C.     The District's Punishment of Disfavored Speech**

39.     In addition to attempting to eliminate parental rights, the Policy requires

students to use other students' preferred pronouns when speaking.

**ANSWER: Admitted that the Policy stated that "[a]n intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies 103.1 Anti-Bullying and Anti-Harassment, 104.1 Equal Educational Opportunity, and 104.3 Prohibition of Discrimination and/or Harassment Based on Sex per Title IX." This paragraph is otherwise denied.**

40.     Under the Policy, "[a]n intentional and/or persistent refusal by . . . students to respect a student's gender identity is a violation of school board policies 103.1 Anti-Bullying and Harassment, 104.1 Equal Educational Opportunity, and 104.3 Prohibition of Discrimination and/or Harassment based on Sex Per Title IX."

**ANSWER: Admitted.**

41.     In addition, the Policy prohibits "[r]epeated or intentional misgendering." The Policy defines "misgendering" as "intentionally or accidentally us[ing] the incorrect name or pronouns to refer to a person." Potential disciplinary sanctions for using the wrong pronouns or "misgendering" a student "include suspension and expulsion."

**ANSWER: Admitted that Policy stated that "[a]n intentional and/or persistent refusal by staff or students to respect a student's gender identity is a violation of school board policies 103.1 Anti-Bullying and Anti-Harassment, 104.1 Equal Educational Opportunity, and 104.3 Prohibition of Discrimination and/or Harassment Based on Sex per Title IX" and contains the above definition of "misgendering." This paragraph is otherwise denied.**

## IV.     PDE's Members and This Litigation

42.     PDE has members who live in the Linn-Mar district and whose children attend

Linn- Mar schools.

**ANSWER: Denied for lack of information.**

43.     Parents A, B, C, D, E, F, and G are members of PDE.

**ANSWER: Denied for lack of information.**

44.     Parent A lives within the boundaries of the Linn-Mar and is the parent of a school- aged child. Parent A's child recently completed the sixth grade at a Linn-Mar elementary school.

**ANSWER: Denied for lack of information.**

45.     Parent A's child is on the autism spectrum and has a sensory processing disability. As a result, Parent A's child has difficulty distinguishing between male characteristics and female characteristics. Parent A's family has devoted significant resources to therapy services to help their child understand sex-specific differences. Still, Parent A's child sometimes makes statements that could lead an outside observer to believe that they are confused about their gender identity or expressing a "gender-fluid" or "non-binary" identity.

**ANSWER: Denied for lack of information.**

46.     As a parent, Parent A is keenly aware of research showing that adolescents on the autism spectrum are far more likely to assert a transgender or "non-binary" identity than neurotypical adolescents.

**ANSWER: Denied for lack of information.**

47.     Parent A is also aware that several children on the autism spectrum at Linn-Mar middle schools or Linn-Mar High School have recently asserted transgender or "non-binary" identities.

**ANSWER: Denied for lack of information.**

48.     Parent A's child was scheduled to begin seventh grade at a Linn-Mar middle school.  Parent A knows that, beginning in seventh grade, the Policy categorically forbids school officials from revealing any information about a student's gender identity to their parents without the student's express permission.

**ANSWER:  Denied that the Policy "categorically forbids" anything. This paragraph is otherwise denied for lack of information.**

49.     Because Parent A's child has difficulty distinguishing between male characteristics and female characteristics and often makes statements that are easily misinterpreted, Parent A is deeply concerned that their child will say something at school that will be interpreted as an assertion of a "gender fluid," "non-binary," or transgender identity by Linn-Mar officials who do not know Parent A's child as well as Parent A does.

**ANSWER:  Denied for lack of information.**

50.     Parent A believes there is a substantial risk that their child will receive a Gender Support Plan or other gender-specific treatment without their knowledge or consent if their child begins middle school at Linn-Mar this August.

**ANSWER:  Denied for lack of information.**

51.     Parent A wants to ask the District on a regular basis whether their child has requested or been given a Gender Support Plan, whether their child has made requests or actions have been taken concerning their child's gender identity, and whether the District has any other information that would reveal their child's "transgender status." Parent A wants to receive this information without seeking "permission" from their child. Policy 504.13-R, however, prohibits school officials from revealing any of this information to Parent A without their child's permission.

**ANSWER: Denied that the Policy "prohibits" school officials from revealing information. This paragraph is otherwise denied for lack of information.**

52.     Parent A also wants to exercise their fundamental right as a parent to guide their child's upbringing and to help their child navigate any issues that might arise regarding their perception of their gender identity.

**ANSWER: Denied for lack of information.**

53.     Under the Policy, however, Parent A knows that when these issues arise, their role will be displaced by Linn-Mar administrators. Parent A knows that the Policy requires school officials to immediately accept and validate a child's expression of gender identity—regardless of their age or development—without questioning how the child arrived at that conclusion.

**ANSWER: Denied.**

54.     Moreover, Parent A's child's social development is far below those of neurotypical children of the same age, so it is unlikely that Parent A's child will be able to understand the scope of this issue or effectively communicate their true preference. Thus, if Parent A's child is assigned a Gender Support Plan or if Linn-Mar officials take other steps to "affirm" that Parent A's child is transgender or "non-binary," Parent A is highly unlikely to learn about those actions.

**ANSWER: Denied.**

55.     Since the Policy was enacted on April 25, Parent A has repeatedly expressed their concerns to Linn-Mar officials and requested confirmation that the school district will not assign their child a Gender Support Plan or take any other gender identity-related actions without informing Parent A and obtaining Parent A's consent. Linn-Mar officials have declined to

provide those assurances.

**ANSWER: Denied for lack of information.**

56.     Parent A knows that their child will likely receive a Gender Support Plan or other gender-specific treatment without Parent A's knowledge or consent if their child begins middle school at Linn-Mar this August. To avoid these harms to their child, Parent A has decided to withdraw their child from enrollment in the Linn-Mar middle school their child was scheduled to attend. The existence and enforcement of the Policy was the primary factor motivating Parent A's decision. If the Policy is rescinded or enjoined, Parent A will enroll their child in middle school at Linn-Mar the following year. If the Policy is not rescinded or enjoined, Parent A will not send their child to middle school at Linn-Mar.

**ANSWER: Denied for lack of information.**

57.     Parent B lives within the boundaries of Linn-Mar and is the parent of a school aged child. Parent B has a daughter enrolled in Linn-Mar High School.

**ANSWER: Denied for lack of information.**

58.     Parent B's daughter has special needs.

**ANSWER: Denied for lack of information.**

59.     As a parent, Parent B is keenly aware of research showing that adolescents with special needs are more likely to assert a transgender or "non-binary" identity than neurotypical adolescents. Parent B also knows that adolescent females comprise a disproportionate percentage of school-aged children who assert transgender or "non-binary" identities.

**ANSWER: Denied for lack of information.**

60.     Some of Parent B's daughter's special-needs classes are held in a classroom that also functions as the meeting location for the LGBT student club. The teacher in that classroom

18

is the faculty advisor for the club. Thus, the classroom walls contain several posters with information about various gender identities, gender "social transitions," and "preferred pronouns." Parent B's daughter is extremely impressionable and often follows the lead of other students.

**ANSWER: Denied for lack of information.**

61. Parent B is deeply concerned that their daughter will say or do something that will be interpreted as an assertion of a gender identity by Linn-Mar officials who do not know her as well as Parent B does. Parent B believes there is a substantial risk that their child will receive a Gender Support Plan or other gender-specific treatment without their knowledge or consent.

**ANSWER: Denied that any student would receive a Gender Support Plan or other gender-specific treatment without their knowledge of consent. This paragraph is otherwise denied for lack of information.**

62. Parent B wants to ask the District on a regular basis whether their child has requested or been given a Gender Support Plan, whether their child has made requests or actions have been taken concerning their child's gender identity, and whether the District has any other information that would reveal their child's "transgender status." Parent B wants to receive this information without seeking "permission" from their child. Policy 504.13-R, however, prohibits school officials from revealing any of this information to me without their child's permission.

**ANSWER: Denied that the Policy "prohibits" school officials from revealing information. This paragraph is otherwise denied for lack of information.**

63. Parent B also wants to exercise their fundamental right as a parent to guide their child's upbringing and to help their child navigate any issues that might arise regarding her perception of her gender identity.

**ANSWER: Denied for lack of information.**

64.     Under the Policy, however, Parent B knows that when these issues arise, Parent B's role will be displaced by Linn-Mar administrators. The Policy requires school officials to immediately accept and validate a child's expression of gender identity—regardless of their age or development—without questioning how the child arrived at that conclusion.

**ANSWER: Denied.**

65.     Moreover, Parent B's daughter's social development is far below those of neurotypical children of the same age, so it is unlikely that she will be able to understand the scope of this issue or effectively communicate her true preferences. Thus, if Parent B's daughter is assigned a Gender Support Plan or if Linn-Mar officials take other steps to "affirm" that she is transgender or "non- binary," Parent B is highly unlikely to learn about those actions.

**ANSWER: Denied that the District would "assign" any student a Gender Support Plan. This paragraph is otherwise denied for lack of information.**

66.     Parent B has repeatedly expressed concerns with this policy, but Linn-Mar officials have refused to confirm that they will inform Parent B about any gender-related issues that pertain to Parent B's daughter or that they will defer to Parent B's wishes as a parent. Parent B is personally aware of several other parents of children with special needs who have expressed similar concerns.

**ANSWER: Denied for lack of information.**

67.     After the Policy was enacted on April 25, Parent B attempted to enroll their daughter in a neighboring school district, but their application was denied because the district's special-needs programs were already at capacity. Because Parent B's daughter requires specialized instruction, enrolling her in private school is not an option.

**ANSWER:  Denied for lack of information.**

68.     Parent C lives within the boundaries of Linn-Mar and is the parent of a school-aged child. Parent C's daughter is enrolled in Linn-Mar High School.

**ANSWER:  Denied for lack of information.**

69.     Parent C believes that people are either male or female, and that although gender dysphoria exists, it is statistically unlikely to persist past adolescence. Parent C is also aware of research that the percentage of adolescents who identify as transgender or "non-binary" has nearly doubled over the past five years.

**ANSWER:  Denied for lack of information.**

70.     Parent C is also aware of clinical research establishing that adolescents are significantly more likely to announce a transgender or "non-binary" identity after other members of their social groups do the same. Moreover, Parent C knows that adolescent girls are more likely to assert a transgender or non-binary gender identity than adolescent males.

**ANSWER:  Denied for lack of information.**

71.     Parent C also knows that children are increasingly likely to "experiment" with gender identity, particularly during adolescence, and that asserting a transgender or "non-binary" gender identity has increased significantly in Linn-Mar middle schools and Linn-Mar High School.

**ANSWER:  Denied for lack of information.**

72.     To Parent C's knowledge, Parent C's daughter is the only member of her friend group who does not identify as a member of the LGBT community. Based on Parent C's daughter's particular life experiences and Parent C's conversations with her, Parent C believes that there is a substantial risk that she will receive a Gender Support Plan from school

administrators or otherwise receive gender identity-related accommodations from Linn-Mar against Parent C's wishes.

**ANSWER: Denied for lack of information.**

73. Parent C wants to ask the District on a regular basis whether their child has requested or been given a Gender Support Plan, whether their child has made requests or actions have been taken concerning their child's gender identity, and whether the District has any other information that would reveal their child's "transgender status." Parent C wants to receive this information without seeking "permission" from their child. Policy 504.13-R, however, prohibits school officials from revealing any of this information to Parent C without their child's permission.

**ANSWER: Denied that the Policy "prohibits" school officials from revealing information. This paragraph is otherwise denied for lack of information.**

74. Parent C also wants to exercise their fundamental right as a parent to guide their daughter's upbringing and to help their daughter navigate any issues that might arise regarding her perception of her gender identity.

**ANSWER: Denied for lack of information.**

75. Under the Policy, however, Parent C knows that when these issues arise, their role will be displaced by Linn-Mar administrators who do not know Parent C's child as well as Parent C does. Parent C knows that the Policy requires school officials to immediately accept and validate a child's expression of gender identity—regardless of their age—without questioning how the child arrived at that conclusion.

**ANSWER: Denied.**

76. Parent C is concerned that Linn-Mar administrators will create a Gender Support

Plan and facilitate their daughter's gender "transition" without informing Parent C or obtaining Parent C's consent. Parent C also worries that Linn-Mar will prioritize their daughter's decisions about her "preferred pronouns" and "preferred name" at school over Parent C's wishes, even in the absence of a formal Gender Support Plan.

**ANSWER: Denied for lack of information.**

77.     Because the Policy categorically forbids Parent C from accessing certain information about their daughter without her consent, Parent C will have no way of learning whether Linn-Mar is taking these actions. And because Parent C's daughter knows that Parent C has strong feelings about this topic, Parent C has no reason to believe that she would inform Parent C about Linn-Mar's actions.

**ANSWER: Denied that the policy "categorically forbids" anything. This paragraph is otherwise denied for lack of information.**

78.     Parent C is suffering significant emotional distress because Parent C knows that their daughter is likely to be subjected to a Gender Support Plan or similar actions by Linn-Mar officials that are inconsistent with Parent C's fundamental values and implemented without Parent C's knowledge.

**ANSWER: Denied.**

79.     Parent D lives within the boundaries of Linn-Mar and is the parent of a school-aged child. Parent D's child is enrolled in Linn-Mar High School.

**ANSWER: Denied for lack of information.**

80.     Parent D's child believes "that people are either male or female and that a person cannot 'transition' from one sex to another." Parent D's child "has no ill-will towards members of the LGBT community but does not believe that a student who is biologically male

should be referred to as anything other than a 'he,' just because 'their truth' is that they are actually female on the inside." Parent D's child does not want to be forced to affirm that a biologically female classmate is actually a male or to refer to a biologically male classmate as a female.

**ANSWER: Denied for lack of information.**

81.     Due to the Policy, however, Parent D's child "either remains silent in school environments or attempts to avoid using pronouns entirely whenever referring to classmates or other third parties." Still, Parent D's child "knows that 'it is only a matter of time'" until they are forced to confront the issue directly.

**ANSWER: Denied for lack of information.**

82.     Parent D wants their child to be educated in a challenging environment that involves the free exchange of ideas, and to be free to express their beliefs, even if others disagree with those beliefs or find them offensive. Parent D does not want their child to be forced to affirm beliefs about gender identity that are inconsistent with their child's deeply held convictions.

**ANSWER: Denied for lack of information.**

83.     Under the Policy, Parent D's child can be punished merely for expressing an opinion about the nature of biological sex. Parent D is concerned that their child will be subjected to formal discipline that will harm their child's college admission chances, unless Parent D's child expresses an ideology that they do not believe.

**ANSWER: Denied that the Policy provided that a "child can be punished merely for expressing an opinion about the nature of biological sex." This paragraph is otherwise denied for lack of information.**

84.     Parent E lives within the boundaries of Linn-Mar and is the parent of a school-

aged child. Parent E's child is enrolled in an elementary school in Linn-Mar.

**ANSWER: Denied for lack of information.**

85.     Parent E has raised their child to believe that people are either male or female, and that "a boy cannot become a girl, or vice versa." Parent E has taught their child to be charitable to others but also to tell the truth and always stand up for their beliefs, even if other people disagree.

**ANSWER: Denied for lack of information.**

86.     Under the Policy, however, Parent E's child can be disciplined for referring to another student according to their biological sex rather than their gender identity or for merely expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex.

**ANSWER: Denied.**

87.      Parent E wants their child to be educated in a challenging environment that involves the free exchange of ideas, and to be free to express their beliefs, even if others disagree with those beliefs or find them offensive. Parent E does not want their child to be forced to affirm beliefs about gender identity that are inconsistent with their deeply held convictions.

**ANSWER: Denied for lack of information.**

88.     Parent E worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on their child by forcing their child to "choose" between expressing the beliefs they have been taught at home and following the instructions of teachers and other Linn-Mar authority figures. Parent E's constant anxiety that their child will be subjected to this harm has, in turn, inflicted emotional and psychological suffering on Parent E.

**ANSWER: Denied for lack of information.**

89.     Parent F lives within the boundaries of Linn-Mar and is the parent of a school-aged child. Parent F's child is enrolled in an elementary school in Linn-Mar. Parent F is married to Parent E.

**ANSWER:  Denied for lack of information.**

90.     Parent F has raised their child to believe that people are either male or female, and that "a boy cannot become a girl, or vice versa." Parent F has taught their child to be charitable to others but also to tell the truth and always stand up for their beliefs, even if other people disagree.

**ANSWER:  Denied for lack of information.**

91.     Under the Policy, however, Parent F's child can be disciplined for referring to another student according to their biological sex rather than their gender identity or for merely expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex.

**ANSWER:  Denied.**

92.     Parent F wants their child to be educated in a challenging environment that involves the free exchange of ideas, and to be free to express their beliefs, even if others disagree with those beliefs or find them offensive. Parent F does not want their child to be forced to affirm beliefs about gender identity that are inconsistent with their deeply held convictions.

**ANSWER:  Denied for lack of information.**

93.     Parent F worries that being disciplined for stating their fundamental beliefs will inflict mental and psychological harm on their child by forcing their child to "choose" between expressing the beliefs they have been taught at home and following the instructions of teachers and other Linn- Mar authority figures. Parent F's constant anxiety that their child will be

subjected to this harm has, in turn, inflicted emotional and psychological suffering on Parent F.

**ANSWER: Denied.**

94.     Parent G lives within the boundaries of Linn-Mar and is the parent of a school-aged child. Parent G's son is enrolled in Linn-Mar High School.

**ANSWER:  Denied for lack of information.**

95.     Parent G has raised their son to believe that biological sex is immutable and does not change based on someone's internal feelings. Parent G has taught their son to be respectful towards others but also to tell the truth and always stand up for his beliefs, even when those beliefs are unpopular.

**ANSWER:  Denied for lack of information.**

96.     Parent G's son believes that people are created either male or female and that a person cannot "transition" from one sex to another. He has no ill-will towards members of the LGBT community, but he does not want to be forced to affirm that a biologically female classmate is actually a male, or vice versa.

**ANSWER:  Denied for lack of information.**

97.     Under the Policy, however, Parent G's son can be disciplined for referring to another student according to their biological sex rather than their gender identity, disagreeing with another student's assertion about whether they are male or female, or for simply expressing discomfort about sharing bathrooms with teachers or students of the opposite biological sex.

**ANSWER:  Denied.**

98.     Because of the Policy, Parent G's son either remains silent in school environments when gender identity topics arise or avoids using sex-specific pronouns altogether.

**ANSWER:  Denied for lack of information.**

99.     Parent G wants their son to be educated in a challenging environment that involves the open exchange of ideas and to be free to express his beliefs, even if others disagree with those beliefs or find them offensive. Parent G does not want their son to be forced to affirm beliefs about gender identity that are inconsistent with his deeply held convictions.

**ANSWER:  Denied for lack of information.**

100.     Parent G is concerned that their son will be subjected to formal discipline that will harm his college admission chances and his extracurricular opportunities, unless he affirms ideas that are inconsistent with his deeply held beliefs. Parent G also worries that being disciplined for stating his fundamental beliefs will inflict mental and psychological harm on their child by forcing him to "choose" between expressing the beliefs he has been taught at home and following the instructions of teachers and other Linn-Mar authority figures. Further, Parent G knows that the process of repeatedly being subjected to discipline for stating his beliefs will expose their son to reputational harm and personal attacks from other students and members of the Linn-Mar community.

**ANSWER:  Denied for lack of information.**

101.     Parent G is considering withdrawing their son from Linn-Mar to prevent him from suffering these harms, and others, from the Policy.

**ANSWER:  Denied that the Policy harms anyone. This paragraph is otherwise denied for lack of information.**

102.     Parents A-G are participating in this litigation under pseudonyms, because they fear that if their identities are discovered, they or their children will suffer retaliation from Linn-Mar and its employees, other students, other parents, and members of the broader community.

**ANSWER:  Admitted that Parents A-G have only provided pseudonyms that prevent**

the District and its counsel from being able to adequately assess Plaintiff's allegations in this action. This paragraph is otherwise denied.

## COUNT I
### Violation of the Fourteenth Amendment
### (Parental Exclusion)

103.    The District incorporates by reference its responses to all preceding paragraphs.

104.    The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, admitted that the quoted language appears in the Fourteenth Amendment. For further response, the District states that the law speaks for itself and this paragraph is otherwise denied.**

105.    Under binding precedent, the Amendment "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Among these unenumerated rights are those that are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257-58 (2022) (quoting *Glucksburg*, 521 U.S. at 721).

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District states that this paragraph contains legal argument, not facts to be admitted or denied. Should any further response be deemed necessary, denied.**

106.    The "liberty interest . . . of parents in the care, custody, and control of their

29

children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65. Nearly 100 years ago, the Supreme Court held that the "liberty" protected by the Fourteenth Amendment includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District states that this paragraph contains legal argument, not facts to be admitted or denied. Should any further response be deemed necessary, denied.**

107.    Two years later, the Court held that the "liberty of parents and guardian" includes the right "to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534- 35 (1925). As the Court explained, "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id*. at 535.

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District states that this paragraph contains legal argument, not facts to be admitted or denied. Should any further response be deemed necessary, denied.**

108.    Again and again, the Supreme Court has affirmed the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (listing cases). Simply put, "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, 406 U.S. at 232. "This primary role of the parents in the upbringing of their children is

now established beyond debate as an enduring American tradition." *Id*.

**ANSWER: Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District states that this paragraph contains legal argument, not facts to be admitted or denied. Should any further response be deemed necessary, denied.**

109.    The Policy violates parents' constitutional rights. The Policy deprives parents of their right to know what actions the District is taking with regards to fundamentally important decisions about their children. PDE's members want to ask on a regular basis whether their children have requested or been given a Gender Support Plan, whether their children have made requests or actions have been taken concerning their children's gender identity, and whether the District has any other information that would reveal their children's "transgender status." Yet under the Policy, the District *will not tell them* any of this information. It is impossible for parents to direct the "care, custody, and control of their children" when the government withholds critical information from them.

**ANSWER: Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, denied.**

110.    The Policy also deprives parents of the right to have any input or control over fundamental decisions concerning gender identity. Under the Policy, the parent has no control over how the District treats their child.

**ANSWER: Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, denied.**

111.    Without *any* parental input, the District can (1) require all employees and students to address the child by a new name; (2) require all employees and students to address

the child through a new pronoun; (3) have the child's name changed on numerous government documents, including identification cards, yearbooks, and diplomas; (4) allow the child to use the restrooms, locker rooms, and changing facilities that correspond with the child's gender identity; (5) allow the child to participate in physical education classes, intramural sports, clubs, and other events that correspond with the child's gender identity; and (6) allow the child to room with other students who share the child's gender identity. These are *fundamental decisions* implementing the most basic questions about a child's life, including issues of religion, medical care, mental and emotional well-being, the child's sense of self, and more.

**ANSWER: Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, denied.**

112.    A recent decision from the District of Kansas is directly on point. There, a local school board policy prohibited teachers from "revealing to a student's parents a preferred name or pronouns the student is using at school if the student has not authorized the parents to know." *Ricard v. USD 475 Geary County, KS*, 2022 WL 1471372, at *4-5 (D. Kan. May 9, 2022). Discussing the "constitutional right [of parents] to control the upbringing of their children," the court found it inconceivable that a school district could constitutionally "withhold[] or conceal[] from the parents of minor children information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." *Id*. at *8. Whether "the District likes it or not," the constitutional right of parents "includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." *Id*.

**ANSWER: Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District**

states that this paragraph contains legal argument, not facts to be admitted or denied. **Should any further response be deemed necessary, denied.**

113.     The Linn-Mar School District "may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name," to use different pronouns, or to implement other decisions involving gender identity. *Id.* But this "merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit." *Id.*

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, denied.**

114.     The government must afford a "presumption of validity" to parental decisions unless there is clear evidence to the contrary. *Troxel*, 530 U.S. at 67. As "long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id*. at 68-69; *see Ricard*, 2022 WL 1471372, at *8 (envisioning a "particularized and substantiated concern that disclosure to a parent could lead to child abuse, neglect, or other *illegal* conduct"). But "[s]imply because the decision of a parent is not agreeable to a child … does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 60.

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, the District states that this paragraph contains legal argument, not facts to be admitted or denied.**

**Should any further response be deemed necessary, denied.**

115.    Here, the District "not only fail[s] to presume" that parents will "act in the best interest of their children, [it] assume[s] the exact opposite." *Doe v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003). The District has *no right* to deprive parents of this critical information and control concerning their child. The Policy plainly violates the Fourteenth Amendment.

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, denied.**

116.    Linn-Mar adopted this policy "under color of state law" within the meaning of Section 1983.

**ANSWER:  Plaintiff's allegations in Count I are moot, as recognized by the Eighth Circuit in its September 29, 2023 ruling. To the extent a response is required, admitted that the Policy was adopted by the District's Board of Directors. This paragraph is otherwise denied for lack of information.**

## COUNT II
### Violation of the First Amendment
### (Compelled Speech)

117.    The District incorporates by reference its responses to all preceding paragraphs.

118.    The Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "[T]he latter is perhaps the more sacred of the two rights." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019).

**ANSWER:  This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

119.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus*, 138 S. Ct. at 2463.

**ANSWER:  This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

120.    The Policy is no different from the policy requiring schoolchildren to pledge alliance to the flag in *Barnette*. Like the West Virginia State Board of Education in *Barnette*, *cf.* 319 U.S. at 631, 633, Linn-Mar is requiring students to affirmatively declare statements that they believe to be false and affirm ideologies with which they deeply disagree.

**ANSWER:  Denied.**

121.    *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), is directly on point. There, the Sixth Circuit held that a similar "preferred pronoun" requirement was "anathema to the principles underlying the First Amendment." *Id*. at 510. "Indeed, the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.* (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)). The District cannot force the children of PDE's members to "mouth support" for beliefs they do not hold. *Janus*, 138 S. Ct. at 2463.

**ANSWER:  This paragraph contains legal argument, not facts to be admitted or**

denied. To the extent a response is required, denied.

122.  Linn-Mar adopted this policy "under color of state law" within the meaning of Section 1983.

**ANSWER:  Admitted that the Policy was adopted by the District's Board of Directors. This paragraph is otherwise denied for lack of information.**

## COUNT III
## Violation of the First Amendment
## (Content and Viewpoint-Based Discrimination)

123.  The District incorporates by reference its responses to all preceding paragraphs.

124.  "If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.*, 502 U.S. 105, 118 (1991). "Content-based regulations" are "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Accordingly, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see, e.g., Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 123 (D. Mass. 2003) (school policy allowing only "responsible" speech was a content-based regulation subject to strict scrutiny).

**ANSWER:  This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

125.  In addition, "the First Amendment's hostility to content-based regulation extends" to "restrictions on particular viewpoints." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015). Viewpoint discrimination is flatly prohibited. *See Iancu v. Brunetti*, 139 S. Ct.

2294, 2302 (2019); *Mahanoy*, 141 S. Ct. at 2046 (schools cannot "suppress speech simply because it is unpopular").

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

126.    Here, the District has adopted a policy that disciplines students for the content and viewpoint of their speech. Specifically, the Policy prohibits "an intentional and/or persistent refusal to respect a student's gender identity." The Policy also prohibits "misgendering," which it defines as instances "[w]hen a person accidentally or intentionally uses the incorrect name or pronouns to refer to a person." This is a classic content-based and viewpoint-based regulation of speech. *See, e.g., Saxe v. State College Area School District*, 240 F.3d 200, 206 (3d Cir. 2001) (bans on "'harassment'" covering speech impose "'content-based'" and often "'viewpoint-discriminatory'" restrictions on that speech). The District has no compelling interest in suppressing this type of student speech, and, even if it did, the District's restrictions are not narrowly tailored to further that interest. *See Mahanoy*, 141 S. Ct. at 2046; *see also Willson v. City of Bel-Nor, Missouri*, 924 F.3d 995, 1001 (8th Cir. 2019).

**ANSWER: Denied.**

127.    Linn-Mar adopted this policy "under color of state law" within the meaning of Section 1983.

**ANSWER: Admitted that the Policy was adopted by the District's Board of Directors. This paragraph is otherwise denied for lack of information.**

## COUNT IV
## Violation of the First Amendment
## (Overbreadth)

128.    The District incorporates by reference its responses to all preceding paragraphs.

129.    The First amendment also prohibits the government from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). Schools must carefully craft their regulations "to punish only unprotected speech and not be susceptible of application to protected expression." *Id*.

**ANSWER:  This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

130.    The Policy is unconstitutionally overbroad. By its terms, the Policy applies to protected speech. And virtually any opinion or political belief—as well as any use of humor, satire, or parody— could be perceived as "a refusal … to respect a student's gender identity." The Policy also does not differentiate between "on campus" and "off campus" speech, even though the District's ability to punish off-campus speech is extremely limited. *See Mahanoy*, 141 S. Ct. at 2046. Courts regularly find these types of far-reaching school policies to be unconstitutionally overbroad. *See, e.g., Saxe*, 240 F.3d at 215-16 (high school speech policy punishing "harassment" was overbroad because it "prohibit[ed] a substantial amount of non-vulgar, non-sponsored student speech"); *Flaherty v. Keystone Oaks School Dist.*, 247 F. Supp. 2d 698, 701-02 (W.D. Penn. 2003) (speech policy prohibiting "abusive," "inappropriate," and "offen[sive]" language was overbroad).

**ANSWER:  Denied.**

131.    Linn-Mar adopted this policy "under color of state law" within the meaning of Section 1983.

**ANSWER:** Admitted that the Policy was adopted by the District's Board of Directors. This paragraph is otherwise denied for lack of information.

### COUNT V
### Violation of the First and Fourteenth Amendments
### (Void for Vagueness)

132. The District incorporates by reference its responses to all preceding paragraphs.

133. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007); *see also Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1311 (8th Cir. 1997) ("a central purpose of the vagueness doctrine" is to prevent "arbitrary and discriminatory enforcement").

**ANSWER:** This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.

134. "With respect to the first goal, ... '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Ass'n of Cleveland Fire Fighters*, 502 F.3d at 551 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, ... 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id*. (quoting *Grayned*, 408 U.S. at 108-09).

**ANSWER:** This paragraph contains legal argument, not facts to be admitted or

**denied. To the extent a response is required, denied.**

135.     his principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

**ANSWER: This paragraph contains legal argument, not facts to be admitted or denied. To the extent a response is required, denied.**

136.     The Policy, among other things, lacks any definitions, detail, context, or notice to students about what sorts of statements Linn-Mar views as "an intentional or persistent refusal…to respect a student's gender identity." This provision guarantees arbitrary enforcement and is therefore unconstitutional.

**ANSWER: Denied.**

137.     Linn-Mar adopted this policy "under color of state law" within the meaning of Section 1983.

**ANSWER: Admitted that the Policy was adopted by the District's Board of Directors. This paragraph is otherwise denied for lack of information.**

### General Denial

Any allegation not specifically admitted herein is denied.

### Further Answers and Affirmative Defenses

1.     Plaintiff fails to state a claim upon which relief can be granted.

2.     Plaintiff does not have standing to bring the above claims.

3.     Plaintiff's claims are moot.

4.     The District asserts that it may have other separate and additional defenses and reserves the right to amend this answer to assert such defenses as become apparent through the course of discovery

WHEREFORE, Defendants Linn-Mar Community School District, Shannon Bisgard, Brittania Morey, Clark Weaver, Barry Buchholz, Sondra Nelson, Matt Rollinger, Melissa Walker, and Rachel Wall request that Plaintiff's Complaint be dismissed, with costs assessed against Plaintiff, and for such other relief as the Court deems appropriate.

*/s/ Miriam D. Van Heukelem*
Miriam D. Van Heukelem (AT0010074)
*/s/ Emily A. Kolbe*
Emily A. Kolbe (AT0012313)
AHLERS & COONEY, P.C.
100 Court Avenue, Suite 600
Des Moines, Iowa 50309
(515) 243-7611
(515) 243-2149 (fax)
mvanheukelem@ahlerslaw.com
ekolbe@ahlerslaw.com
ATTORNEYS FOR DEFENDANTS

**Electronically filed and served.**

Alan R. Ostergren
Alan R. Ostergren PC
500 Locust Street, Suite 199
Des Moines, IA 50309
alan.ostergren@ostergrenlaw.com

J. Michael Connolly
James F. Hasson
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
mike@consovoymccarthy.com
james@consovoymccarthy.com

02265278-1\17071-1601

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on: October 23, 2023

By: ☐ U.S. Mail          ☐ Fax
    ☐ Hand delivery          ☐ Private Carrier
    ☒ Electronically (*via M/ECF*)          ☐ E-mail

Signature:          */s/ Pam Norelius*